110 Cal.Rptr.2d 272 (2001)
28 Cal.4th 334
26 P.3d 34
The PEOPLE, Plaintiff and Respondent,
v.
Raymond Anthony LEWIS, Defendant and Appellant.
No. S020032.
Supreme Court of California.
August 2, 2001.
Rehearing Denied September 19, 2001.
*284 Thomas Kallay, Los Angeles, under appointment by the Supreme Court, for Defendant and Appellant.
Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, William G. Prahl, Robert P. *285 Whitlock and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.
CHIN, J.
A jury convicted defendant Raymond Anthony Lewis of the first degree murder (Pen.Code,[1] §§ 187, 189) and robbery (§ 211) of Sandra Simms, and found true the allegation that he personally used a deadly weapon, i.e., a wooden object, to commit the crimes. (§ 12022, subd. (b)(1).) The jury also found true the special circumstance allegation that defendant committed the murder in the course of a robbery. (§ 190.2, subd. (a)(17)(A).) Defendant admitted suffering three prior convictions.
After the penalty trial, the jury returned a verdict of death, and the trial court imposed the sentence. The trial court denied his motion for a new trial or to modify the verdict (§ 1181, subds. 6 & 7), and his automatic application for modification of the verdict. (§ 190.4, subd. (e).) This appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).) For reasons that follow, we affirm the judgment in its entirety.

I. Facts

A. Guilt Phase

1. Prosecution Evidence
The prosecution's main witness, Paul Pridgon, testified that he saw defendant repeatedly beat Sandra Simms with a two-by-four wooden board, strangle her, and take money from her person.
On June 6, 1988, the night of the murder, Simms, defendant, and his girlfriend, Michelle Boggs, smoked cocaine at defendant's boardinghouse. Defendant had met Simms approximately a month before, through Boggs. Later that night, Simms gave defendant money to buy more drugs. On his way to buy the drugs, defendant met Paul Pridgon for the first time. Pridgon took him to a drug dealer.
Afterwards, Pridgon took defendant to his apartment, which Pridgon shared with several individuals, where they smoked more drugs. Concerned that defendant may have run off with her money, Simms and Boggs went to look for him. When they found defendant and Pridgon, Simms repeatedly asked where her money was. Defendant said that he would get it, and left with Pridgon. When defendant and Pridgon later arrived at defendant's boardinghouse where Simms and Boggs were waiting, defendant pulled Simms aside and told her that he could buy $100 worth of crack cocaine for $30.
Defendant, Simms, and Pridgon went to buy the crack. Pridgon testified that earlier that evening, defendant had said he was going to knock down a prostitute who he knew had money. Defendant asked Pridgon if he was "down for taking the money." Pridgon answered "yeah," without understanding what defendant had said. When defendant repeated his plan, Pridgon stated, "No. I don't do that kind of stuff." Defendant replied, "Well, I[`ll] do it my damn self."
The trio walked down an alley toward Pridgon's apartment. Defendant grabbed a two-by-four wooden board that he said he would use to hit dogs. As they got close to Pridgon's apartment, defendant swung the two-by-four like a baseball bat at Simms's head. Simms, who was looking in another direction, fell down after the first blow. Defendant struck Simms with the two-by-four approximately six more times. Getting on top of Simms, defendant straddled her waist with his legs, *286 grabbed her throat with his hands, and strangled her. He then ripped her blouse and took money out of her bra.
Defendant threatened Pridgon that he would kill him if he said anything. The two began walking. Defendant gave Pridgon a stainless steel butter knife, which Pridgon threw into a trash can nearby. As they walked onto a main street, defendant threw the two-by-four into a backyard.
After the crime, defendant and Pridgon went back to Pridgon's apartment to smoke drugs that they had just purchased. Pridgon did not tell anyone at his apartment about the murder. Defendant, Pridgon, and Betty Thomas, who lived with Pridgon, left together to get more drugs. As they passed the alley where Simms's body lay, a man told them, "Don't go through the alley because this Black guy done killed a woman."
When Pridgon came back to his apartment, he told Lorene Allen, who was Thomas's mother and also lived with Pridgon, that defendant killed Simms. Allen did not believe him and said he was lying. Although Pridgon wanted to tell the police about the murder, Allen told him, "Don't do that, because you will get yourself in big trouble you can't get out of."
A man driving in the alley first discovered Simms's body. When a Fresno police officer arrived, he found Simms lying dead on her back. There was a pool of blood by her head, along with blood splatters spreading as far as 7 feet 10 inches away from her head. The left side of her face contained a large cut, and her neck had several razor-like cuts. A wood splinter was found in Simms's hair and a small clump of her hair was found by her right side. Simms's blouse was splattered with blood and partially open, with the two top buttons ripped off. Her lace bra contained a $20 bill. Simms's purse contained a check stub from Carl's Jr., a fast-food restaurant where Simms had worked. Employee and bank records showed Simms had cashed her $167.62 paycheck, which she had received the day she was killed.
The morning after the murder, Pridgon told police that defendant had killed Simms. Pridgon led a detective to the following items: the butter knife; the 18to 24-inch-long two-by-four; and the woodpile from which defendant had picked up the two-by-four. The recovered two-by-four, which was chipped on one end, contained traces of human blood. The wood splinter found in Simms's hair fit the chipped end of the two-by-four. Criminologists, however, could not develop usable fingerprints from either the two-by-four or the butter knife, and could not assign a specific phosphoglucomutase (PGM) enzyme to the blood found on the two-by-four.
Defendant was arrested at his boardinghouse. Before being taken to police headquarters, defendant, who was barefoot, asked to put on some shoes. Detective Sanchez, who arrested defendant, stated defendant pointed to a pair of size 10 ladies' white Converse tennis shoes, which Detective Sanchez handed to defendant to put on. Defendant, who was wearing blue sweatpants, also asked for a green jacket hanging on his bed.
Tests on the right tennis shoe revealed the shoe contained human blood with a PGM type of two-plus, two-minus, which matched Simms's blood and that of approximately 2 percent of the population. However, the criminologist could not determine conclusively the source of the blood. Defendant's sweatpants and jacket also had traces of blood, but criminologists could not determine if the blood was human blood.
*287 The pathologist confirmed that Simms's injuries were consistent with her being struck by a wooden object, like a two-by-four. He testified that Simms's head and face were struck approximately four to six times. He found multiple injuries only on Simms's face, head, and neck, which included injuries consistent with strangulation. He opined that Simms had been standing when she was first struck on the left side of her jawbone, fracturing her jawbone and rendering her unconscious. She sustained basal skull fractures when she fell to the ground and hit the right side of her head. Simms was alive but unconscious when she was strangled because there were no signs of resistance or struggle. The pathologist determined that strangulation was the main cause of death, with cerebral contusions from the basal skull fractures as a second or contributing cause.

2. Defense Evidence
As his main defense, defendant attacked Pridgon's credibility, and presented evidence suggesting that Pridgon was to some extent involved in the crimes.
Defendant testified on his own behalf. He denied killing or hurting Simms, who was like a mother to him and even called him "son." He further denied being "hooked on" cocaine the night of the killing or needing any money. He last saw Simms when she, defendant, and Pridgon left defendant's boardinghouse for Pridgon's apartment because defendant wanted to pursue a woman who lived with Pridgon. As the three reached Pridgon's apartment, a Black man in a white Cadillac drove up and began talking to Simms. Simms got in the car and told defendant, "Mommy be right back," and said that she would return in 20 to 25 minutes. Simms and the man drove down the alley. When defendant and Pridgon went inside Pridgon's apartment, defendant noted the time was 11:50 p.m.
Defendant attacked the credibility of Pridgon, who was 23 years old at the time of trial. Through expert witnesses, defendant presented evidence that Pridgon suffered from mental disorders, mild mental retardation, and substance abuse. Experts testified that Pridgon's capacity to perceive and recollect Simms's killing was impaired, and that he made up information to fill in gaps in his memory. Defendant claimed that Pridgon imagined that defendant strangled Simms after listening to the pathologist's testimony. Defendant also argued Pridgon suffered from hallucinations, as evidenced from Pridgon's testimony that he heard blood flow from Simms's head, and heard defendant take money from Simms's bra. To further impeach Pridgon's credibility, defendant presented evidence of Pridgon's felony conviction for burglary and his conviction for being under the influence of cocaine. Two investigators who had dealt with Pridgon before believed him to be dishonest and untrustworthy. Based on numerous inconsistencies between Pridgon's testimony at trial and at the preliminary hearing, defendant moved to strike Pridgon's entire testimony. The trial court denied the motion.
Defendant also attacked the source and weight of the physical evidence. First, defendant testified that at the time of his arrest, Detective Sanchezand not defendantpicked out the tennis shoes, green jacket, and blue sweatpants for defendant to wear. Defendant claims he was wearing other clothes and shoes at the time. At trial, defendant maintained the tennis shoes and green jacket did not fit him, and did not belong to him. Instead, defendant testified he saw Pridgon wearing the jacket and remembered Pridgon *288 wearing the tennis shoes on the night of the murder.
Defendant also presented testimony from a shoe store owner who opined the bloody tennis shoes fit Pridgon better than they fit defendant. Witnesses testified that Pridgon had a habit of carrying sticks, and was known as "Crazy Paul" in the neighborhood. Based on the foregoing, defendant argued that Pridgon was to some extent involved in the crimes, i.e., Pridgon either killed Simms himself, assisted in the particular crimes, or watched or was present as someone other than defendant killed Simms.

B. Penalty Phase

1. Prosecution Evidence
As factors in aggravation, the prosecution introduced evidence that defendant, when he was 13 years old, had participated in the 1975 murder of A.Z. Rogers. Defendant and his two friends poured gasoline into Rogers's car, where he was sleeping, and then threw a lit match. Rogers died from smoke inhalation and second and third degree burns covering 95 percent of his body.
The prosecution also introduced evidence that defendant had been involved in the 1982 residential burglary and robbery of 81 year old Mariana Cardoza, the 1986 residential burglary and attack upon Norman Logan, and the 1986 residential burglary and attack upon Steven Ohler. While in jail in 1986, defendant punched, kicked, and threatened a fellow inmate with a shank, a jail-made weapon. In 1989, defendant created a jail disturbance by starting a fire, and attempted to stab an officer with a shank. The prosecution also showed that defendant was involved in a number of purse snatchings in April 1986.[2]
The prosecution introduced evidence of defendant's prior convictions for robbery (Pen.Code, § 211), receiving stolen property (id., § 496), and two counts of transporting, selling, and furnishing phencyclidine (PCP). (Health & Saf.Code, § 11379.)

2. Defense Evidence
As factors in mitigation, defendant presented expert testimony from Dr. Callahan, a psychiatrist, that, given defendant's prior convictions and violent past, he suffered from an antisocial personality disorder. Based on his review of defendant's prior medical records, Dr. Callahan concluded that previous doctors examining defendant in 1975 had diagnosed him with paranoid schizophrenia with episodic violent behavior, impaired judgment, and borderline intelligence. Those doctors concluded that defendant should be placed in a psychiatric facility where he would receive antipsychotic medication and other drugs; however, this did not occur. Although defendant took the major tranquilizer Mellaril while he was in the California Youth Authority (CYA), he had not taken any medication from January 1, 1990, through the time of the penalty phase. Dr. Callahan concluded that defendant lived in a very unstructured and unsupervised environment, which in part may have accounted for defendant's criminal conduct. Dr. Callahan opined that a structured environment and medication would help prevent defendant from acting out violently. Dr. Callahan noted that antisocial personality disorder tends to diminish in adulthood. Defendant told Dr. Callahan that he wished to pursue an education in prison.
*289 An expert witness, psychologist Dr. Adams, interviewed defendant a week before defendant testified. Dr. Adams concluded that defendant met the criteria for antisocial personality disorder given his criminal history, his incarceration for most of his life since he was 14 years old, and his inability to establish long-term relationships. Dr. Adams opined defendant's lack of a male role model adversely affected his character and personality development.
Odell Rogers, the brother of Rogers and the boyfriend of defendant's mother, testified that he had warned Rogers about carrying gas in his car because he smoked and used matches. Odell Rogers was not afraid of defendant.
Defendant also introduced character evidence, which included the following testimonies: Minnie Lewis, defendant's mother, testified defendant wrote to her every week and told her if he was not executed he wanted to be a counselor to tell kids to stay off drugs and off the streets. She said she loved her son and would be extremely distraught if he were executed. Sandra McCullar, defendant's sister, testified that she spoke to defendant every week in jail, and believed that defendant had changed; that he talked about God and quoted from the Bible, and told McCullar to stay in school and not use drugs, and his younger half brother to stay in school; and that she would miss defendant very much if he were executed. Cathy Jackson, defendant's cousin, testified defendant offered advice to young people to stay off drugs and out of trouble. She said she would miss him if he were executed.
Defendant also presented testimony regarding his behavior while incarcerated. Dana Crittenden, who worked for the Fresno County Sheriffs Department, testified that defendant always treated her with respect and even intervened when another inmate at court gave her problems. Richard Caldie, a correctional officer for Fresno County, testified defendant never treated him with disrespect or tried to attack him. Marvis Williams, who worked for the Fresno County jail, testified that she knew defendant for a year, he never gave her any problems, he always treated her with respect, and that she liked him.
Finally, defendant presented the testimony of Richard Phillips who then had been an inmate for over 20 years, and had spent more than the last nine and one-half years on death row. Phillips testified that there was much need for counselors for other inmates in prison, and that defendant could eventually become a counselor after a rigorous training and screening process.

II. Discussion

A. Guilt Phase

1. Jury SelectionChallenge for Cause
Defendant argues that the trial court improperly excused Prospective Juror Lloyd G. based on his views against the death penalty. On his jury questionnaire and several times during voir dire, Lloyd G. specifically stated that he was "biased against" the death penalty, and that he saw no need for this type of punishment in society. However, defendant contends the prospective juror stated that he could apply the law according to the court's instructions. Thus, defendant claims the trial court violated his right to a fair and impartial jury under both the state and federal Constitutions by excusing Lloyd G. For reasons that follow, we disagree.
"`"[I]n a capital case, a prospective juror may be excluded if the juror's views on *290 capital punishment would `prevent or substantially impair' the performance of the juror's duties." [Citations.] "A prospective juror is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate." [Citation.]' [Citation.]" (People v. Jenkins (2000) 22 Cal.4th 900, 987, 95 Cal. Rptr.2d 377, 997 P.2d 1044.) "If the prospective juror's responses to voir dire questions are conflicting or equivocal, the trial court's determination of the juror's true state of mind is binding upon the reviewing court. [Citations.]" (People v. Bradford (1997) 15 Cal.4th 1229, 1319, 65 Cal.Rptr.2d 145, 939 P.2d 259.)
We find no error. Lloyd G. stated that the prosecution would have to convince him of the need for capital punishment not only under the particular facts of this case, but also as a general proposition before he would vote to impose it. He thus possessed a bias against the death penalty which "`"`prevented] or substantially impair[ed]'"'" his ability to perform his duty as a juror. (People v. Jenkins, supra, 22 Cal.4th at p. 987, 95 Cal.Rptr.2d 377, 997 P.2d 1044.) Defendant points out, however, that Lloyd G. said he was not totally opposed to the death penalty, and that he could possibly change his mind about voting for life imprisonment rather than death. Despite his bias against capital punishment, the juror stated he could apply the law according to the court's instructions. At the very least, however, Lloyd G.'s responses were "conflicting or equivocal." (People v. Bradford, supra, 15 Cal.4th at p. 1319, 65 Cal.Rptr.2d 145, 939 P.2d 259.) Accordingly, we are bound by the trial court's determination of Lloyd G.'s state of mind. (Ibid.)

2. Claims Relating to the Testimony of Eyewitness Paul Pridgon
Before Pridgon testified, defendant requested that a psychiatrist be present in court during Pridgon's testimony to determine whether he had the capacity to perceive and recollect. Defendant later withdrew his request and agreed with the court that the issue whether Pridgon's capacity to perceive and recollect was impaired was "a matter of impeachment" pursuant to Evidence Code section 780. Neither party requested a hearing outside the jury to determine whether Pridgon was qualified to testify.
On cross-examination, Pridgon testified that when Simms was lying on the ground after defendant had struck her, Pridgon saw and "heard" blood flow from her head, which sounded "[l]ike somebody pouring water in a cup." He also said that he knows how money "sounds." Defendant impeached Pridgon with his preliminary hearing testimony, including the fact that Pridgon failed to mention previously that defendant strangled Simms. When Pridgon testified at trial that he told the investigator about the strangling, he told defense counsel to confirm the strangling with the pathologist. Defendant contends that Pridgon simply overheard the pathologist's testimony and did not actually see defendant strangle Simms. Indeed, defendant points out that Pridgon failed to mention this fact to Lorene Allen, whom he told that defendant killed Simms. Defendant also maintains that Pridgon embellished his testimony with his statement that he purposely fell on his bad knee to allow Simms to run away, which Pridgon failed to mention at the preliminary hearing.
Pridgon also purportedly described an "S," which he saw scrawled on the two-by-four used to kill Simms. Pridgon later clarified that the scrawled "S" was actually ants crawling over the two-by-four. In response to the defense question whether *291 Pridgon's fingerprints were on the knife that defendant discarded, Pridgon testified: "No way my fingerprints. They took my clothes and my prints and my necklace. It was negative to me, is nothing. If it comes out positive me, yes, fingerprints on it. Because I could barely positive negative. Negative means no. There was no fingerprints." At one point, Pridgon refused to answer a defense question regarding Simms's strangulation. Based on the foregoing testimony, defendant stated, "I think I'm going to ask the Court to consider striking all of Mr. Pridgon's testimony . . . [¶] . . . [b]ased on . . . the wholesale impeachment that's been going on of him since he took the stand. . . ." The trial court impliedly denied the request.
After Pridgon testified, defendant called several expert witnesses who testified regarding Pridgon's mental disorders, including his psychosis, paranoia, and, "schizophreniform disorder." Psychiatrist Dr. Kinsey testified that in June 1987, he "triple-diagnosed" then 15-year-old Pridgon with schizophreniform disorder, low IQ, and substance abuse. For Pridgon's psychotic symptoms of anxiety and auditory hallucinations, Dr. Kinsey prescribed an antipsychotic major tranquilizer, which he recommended that Pridgon take for at least a year. His colleague, Dr. Moulder, a psychologist, made a similar diagnosis and added that Pridgon's substance and alcohol use would exacerbate his psychotic symptoms.
Psychologist Dr. Pickering testified that in September 1990, he diagnosed Pridgon with polysubstance abuse and borderline personality, involving characteristics of confusion, uncertainty, inadequacy, fear, and paranoia. He disagreed, however, with other defense experts' diagnoses of schizophreniform disorder. Dr. Pickering believed that Pridgon suffered from confabulation,[3] which he explained is a process where a person goes "from a detail which may or may not be relevant to anything, to almost a giant imaginative leap . . . [which] takes on credibility." In addition, Dr. Pickering opined that Pridgon's drug use impaired his ability to perceive and recollect. Dr. Deutsch, an addiction specialist, opined that smoking large quantities of cocaine over a long period could affect a person's mental processes, which could eventually progress to a psychosis where the person has hallucinations, paranoia, delusions, and increased feelings of hostility. He further testified that an individual suffering from borderline personality, atypical psychosis, or schizophreniform disorder, and who uses cocaine or PCP, is in a much worse position than one who does not.
In rebuttal, the prosecution offered the expert testimony of Dr. Terrell, a psychiatrist, and Dr. Thackrey, a clinical psychologist. Dr. Terrell, who met with Pridgon on several occasions and reviewed prior medical reports and records on Pridgon, testified that Pridgon had the intellect of a seven year old with a similar ability to recollect and comprehend. He also diagnosed Pridgon with substance abuse consisting of cocaine, marijuana, and PCP (which abuse was in remission), and atypical psychosis due to substance abuse. However, because Pridgon's account of the murder was "within the realms of human experience," Dr. Terrell testified that his account did not seem to consist of a psychotic fantasy. He further testified that notwithstanding Pridgon's diagnosed mental disorders and low intellect, "[t]here is *292 nothing that would lead me to believe that he would be incapable of reporting an account of an act of this nature," though Pridgon's degree of accuracy would be that of a seven year old.
Dr. Thackrey's findings were consistent with Dr. Terrell's. He concluded that Pridgon did not meet the criteria to be considered schizophrenic, or that he suffered from delusional symptoms or auditory hallucinations, but noted that Pridgon did suffer from attention deficit hyperactivity disorder resulting in his lack of concentration and increased fidgetiness. Dr. Thackrey found nothing in his review of the record or his assessment of Pridgon that "would necessarily preclude [Pridgon's] ability to remember something that he saw happen or to tell us, at least in general terms, what had happened." Given Pridgon's limited intellectual abilities, Dr. Thackrey opined that "it could be . . . relatively easy to inadvertently confuse Mr. Pridgon or elicit contradictory kinds of statements about details, and the like."
Based in part on defendant's assertion that Pridgon's testimony was "inherently unreliable," defendant moved for a judgment of acquittal, claiming insufficient evidence of guilt. The trial court denied the motion. The trial court also denied defendant's subsequent motion for a new trial or to modify the jury's verdict under section 1181, subdivisions 6 and 7 arguing that Pridgon's unreliable testimony made the verdict "contrary to . . . evidence." On appeal, defendant asserts a number of claims regarding Pridgon's testimony, which we discuss in turn.

a. Capacity to Perceive and Recollect
Defendant argues that Pridgon did not have the necessary capacity to perceive and recollect in order to testify under Evidence Code section 702, subdivision (a). To testify, a witness must have personal knowledge of the subject of the testimony, i.e., "a present recollection of an impression derived from the exercise of the witness' own senses." (Cal. Law Revision Com. com., reprinted at 29B pt. 2 West's Ann. Evid.Code (1995 ed.) foll. § 702, p. 300; Evid.Code, § 702, subd. (a).) In order to have personal knowledge, a witness must have the capacity to perceive and recollect. (See People v. Dennis (1998) 17 Cal.4th 468, 525, 71 Cal.Rptr.2d 680, 950 P.2d 1035.) The capacity to perceive and recollect is a condition for the admissibility of a witness's testimony on a certain matter, rather than a prerequisite for the witness's competency. (Ibid.)[4] Upon a party's objection, a witness's personal knowledge must be shown before the witness may testify regarding the matter. (Evid.Code, § 702, subd. (a); see also id., § 403, subd. (c)(1) [upon a party's request, a court must instruct the jury as to whether a preliminary fact exists before it may consider the proffered evidence].)
"`[I]f there is evidence that the witness has those capacities, the determination whether [he] in fact perceived and *293 does recollect is left to the trier of fact.' [Citations.]" (People v. Dennis, supra, 17 Cal.4th at p. 526, 71 Cal.Rptr.2d 680, 950 P.2d 1035; 2 Witkin, Cal. Evidence (4th ed. 2000) Witnesses, § 46, p. 297 [the capacity to perceive and recollect is "only preliminarily determined by the trial judge, and ultimately redetermined by the jury"].) A trial court should allow a witness's testimony unless "no jury could reasonably find that he has such [personal] knowledge." (Cal. Law Revision Com. com., reprinted at 29B pt. 2 West's Ann. Evid.Code, supra, foil. § 701, p. 284.) "The fact that a witness has made inconsistent and exaggerated statements does not indicate an inability to perceive [or] recollect. . . ." (People v. Willard (1983) 155 Cal.App.3d 237, 240, 202 Cal.Rptr. 100.) Nor does a witness's mental defect or insane delusions necessarily reflect that the witness lacks the capacity to perceive or recollect. (People v. McCaughan (1957) 49 Cal.2d 409, 420, 317 P.2d 974; People v. La Rue (1923) 62 Cal.App. 276, 284, 216 P. 627 ["`It is admissible . . . in order to affect the credibility of the witness, to prove that he was or is subject to insane delusions; that his mind and memory are impaired by disease' "].) A witness's uncertainty about his or her recollection of events does not preclude admitting his or her testimony. (People v. Avery (1950) 35 Cal.2d 487, 492, 218 P.2d 527 [uncertainty of recollection goes to the weight and not admissibility of a witness's testimony].)
Defendant did not timely object to Pridgon's incapacity to perceive and recollect to limit the admissibility of Pridgon's testimony before he testified. Thus, without an objection, the trial court was not required to determine whether Pridgon had personal knowledge before he testified. (Evid.Code, § 702, subd. (a).) Although a party may move to strike a witness's testimony when lack of personal knowledge is shown on cross-examination (Cal. Law Revision Com. com., reprinted at 29B pt. 2 West's Ann. Evid.Code, supra, foil. § 702, p. 300), defendant did not challenge Pridgon's testimony on this basis. Rather, defendant agreed that Pridgon's capacity to perceive and recollect was "a matter of impeachment," and proceeded to impeach his capacity through cross-examination and expert testimony. (Evid.Code, § 780, subd. (c); see also People v. Cooks (1983) 141 Cal.App.3d 224, 302, 190 Cal.Rptr. 211 ["A witness may be cross-examined about his mental condition or emotional stability to the extent it may affect his powers of perception, memory (recollection), or communication"].) Thus, defendant's failure to object timely on the basis of Evidence Code section 702, subdivision (a), constitutes a waiver of this claim on appeal. (See People v. Cudjo (1993) 6 Cal.4th 585, 622, 25 Cal.Rptr.2d 390, 863 P.2d 635 [party must object to witness's lack of testimonial competence to preserve this claim on appeal].) Even assuming, however, that defendant had timely and specifically objected on this ground (see Evid.Code, § 353), we find no substantial basis for the trial court to have excluded Pridgon's testimony.
Although Pridgon's testimony may have consisted of inconsistencies, incoherent responses, and possible hallucinations, delusions and confabulations, Pridgon "presented a plausible account of the circumstances of [Simms's] murder." (People v. Anderson (2001) 25 Cal.4th 543, 574, 106 Cal.Rptr.2d 575, 22 P.3d 347 [witness who suffered from delusions was not incompetent to testify].) Pridgon testified to many details of the crime, which were unlikely to be known by anyone not present, and which were independently corroborated by the evidence. He also led police to the place where the two-by-four was discarded. Moreover, despite instances of *294 Pridgon's incomprehensible testimony (often on cross-examination), he also testified lucidly, albeit simply, throughout trial. For instance, after Pridgon testified he saw defendant get on top of Simms after striking her, the prosecution asked if defendant did anything to her. Pridgon replied, "Yeah, he had his hand right here. (Indicating.)
"Q[:] All right. Now you said he had his hand `right here'?
"A[:] On her throat.
"Q[:] `On the throat,' okay. And you showed me something with your hand. Whatwhat was it that you saw him doing with his hand?
"A[:] He tore her blouse up, and stick his hand up there in her bosom."
In short, there was no substantial basis for the court to exclude Pridgon's testimony; rather, it was up to the jury to determine whether Pridgon's recollections were true. (People v. Anderson, supra, 25 Cal.4th at p. 574, 106 Cal.Rptr.2d 575, 22 P.3d 347; see also People v. McCaughan, supra, 49 Cal.2d at p. 420, 317 P.2d 974; People v. Avery, supra, 35 Cal.2d at p. 492, 218 P.2d 527; People v. Willard, supra, 155 Cal.App.3d at p. 240, 202 Cal.Rptr. 100.) Although defendant maintains that Pridgon's intimate knowledge of the crimes indicated that Pridgon and not defendant committed the crimes, this is a separate issue from whether Pridgon had the capacity to perceive and recollect.
Moreover, contrary to defendant's contention, we cannot conclude that Pridgon's testimony about hearing blood flow was improbable as a matter of law. (See, e.g., People v. Crowell (1988) 198 Cal. App.3d 1053, 1057, 244 Cal.Rptr. 296 [stabbing victim "`could hear the air and the blood bubbling out my back'"]; People v. Fernandez (1950) 301 N.Y. 302, 316, 93 N.E.2d 859 [defendant "`could hear blood dripping'" from victim who was lying flat on the floor]; State v. Oslund (1985) 71 Or.App. 701, 704, 693 P.2d 1354 [defendant "heard [shooting victim's] blood dripping on the floor"].) Nor can we conclude as a matter of law that Pridgon could not hear the sound of money. The rustling of paper money is an audible sound. (See, e.g., Rushing v. State (Ind.1983) 449 N.E.2d 597, 598 [witness to robbery did not see defendant take money from the cash register but "heard the sound of money rustling and cash drawer clips flopping"].)
Indeed, in ruling on defendant's subsequent motion for a new trial, the trial court stated: "The Court sat approximately four to six feet from Pridgon during his entire trial testimony. The Court had an ample opportunity to observe the demeanor and manner in which Mr. Pridgon testified. In addition, the Court had an opportunity to observe the attitude of Mr. Pridgon toward this action and toward the giving of testimony in general. It is clear that Mr. Pridgon suffers from some type of mental problem. At the very least it can be said that he is a slow learner, [¶] However, the Court believed [Pridgon's testimony regarding the murder]." The trial court rejected defendant's contention that Pridgon hallucinated the death and the manner of killing. Although the court noted that Pridgon's testimony included inconsistencies (and did not attempt to reconcile them), it stated that, "The Court can only reiterate that at no time has the Court questioned the credibility of Mr. Pridgon on the fact that the Defendant killed Sandra Simms and took money from her person at the time of the killing."
As noted, because defendant failed to object that Pridgon had the capacity to perceive and recollect in order to testify, the trial court had no occasion to consider this issue. However, based on the record before us, we conclude that the trial *295 court's statements regarding Pridgon's credibility strongly suggest that the court would have overruled defendant's objection and rejected his argument on this claim. To that end, we reject defendant's contention that the trial court erroneously believed that Pridgon's capacity to perceive and recollect was an issue relating only to impeachment. The trial court's statements noted above reflect that it believed Pridgon had such capacity.
Plainly, Pridgon fell well short of being an ideal witness. As the prosecution's psychologist testified, it would be easy to inadvertently confuse Pridgon, given his limited intellectual abilities. Inevitably, his confusion mounted when someone motivated to make him look incredibleas defense counsel wasasked the questions. As a reviewing court, we confront a cold record without the trial court's benefit of observing firsthand the appearance and demeanor of the witness. Here, both the jury and trial court found that Pridgon was a credible witness, and we must give proper deference to such findings. (People v. Jones (1968) 268 Cal. App.2d 161, 165, 73 Cal.Rptr. 727.)
Thus, we reject defendant's constitutional challenges based on his right of confrontation protected by the Sixth and Fourteenth Amendments to the United States Constitution, his rights to due process, to present a defense, to a trial by jury, and to a reliable conviction afforded under the Eighth and Fourteenth Amendments, and his right to a reliable, individualized capital sentencing determination guaranteed under the Eighth Amendment. For similar reasons, we reject defendant's claim of ineffective assistance of counsel for failing to timely object to Pridgon's capacity to perceive and recollect, or for otherwise conceding Pridgon's capacity was a "matter of impeachment." Where "there was no sound legal basis for objection, counsel's failure to object to the admission of the evidence cannot establish ineffective assistance." (People v. Cudjo, supra, 6 Cal.4th at p. 616, 25 Cal.Rptr.2d 390, 863 P.2d 635.)

b. Competency
Defendant also contends that Pridgon was incompetent to testify under Evidence Code section 701, subdivision (a). A person is incompetent and disqualified to be a witness if he or she is "[i]ncapable of expressing himself or herself concerning the matter so as to be understood, either directly or through interpretation by one who can understand him" (Evid.Code, § 701, subd. (a)(1)), or is "[i]ncapable of understanding the duty of a witness to tell the truth." (Evid.Code, § 701, subd. (a)(2).) "[T]he burden of proof is on the party who objects to the proffered witness, and a trial court's determination will be upheld in the absence of a clear abuse of discretion. [Citations.]" (People v. Anderson, supra, 25 Cal.4th at p. 573, 106 Cal.Rptr.2d 575, 22 P.3d 347; see also People v. Mincey (1992) 2 Cal.4th 408, 444, 6 Cal.Rptr.2d 822, 827 P.2d 388.) The challenging party must establish a witness's incompetency by a preponderance of the evidence. (People v. Farley (1979) 90 Cal.App.3d 851, 869, 153 Cal.Rptr. 695; see also Evid.Code, § 405; 1 Jefferson, Cal. Evidence Benchbook, supra, § 25.6, p. 400.) Unlike a witness's personal knowledge, a witness's competency to testify is determined exclusively by the court. (3 Witkin, Cal. Evidence, supra, Presentation at Trial, § 61, p. 93; see Evid.Code, § 405, subd. (a).)
Defendant failed to object at trial to Pridgon's competency and in fact expressly stated that Pridgon was competent to testify. Accordingly, his claim is waived on appeal. (People v. Cudjo, supra, 6 Cal.4th at p. 622, 25 Cal.Rptr.2d *296 390, 863 P.2d 635["[d]efendant may not circumvent this objection requirement by claiming that the trial court should have inquired into the witness's qualifications on its own"].) Defendant argues, however, that he effectively retracted his waiver by later moving to strike Pridgon's entire testimony during trial. Assuming, however, that defendant timely and specifically objected to Pridgon's competence through his motion to strike (Evid.Code, § 353, subd. (a)), we find no substantial basis for the trial court to determine that Pridgon was incompetent to testify.
Although Pridgon may have suffered from mental disorders and his testimony was difficult to comprehend at times, the record does not support the claim that he was incapable of communicating so as to be understood, pursuant to Evidence Code section 701, subdivision (a)(1). (See People v. Anderson, supra, 25 Cal.4th at p. 574, 106 Cal.Rptr.2d 575, 22 P.3d 347 [no substantial evidence that witness, who delusionally believed imaginary son was present during murder, lacked capabilities under Evid.Code, § 701, subd. (a)(1) & (2) ]; People v. Jones, supra, 268 Cal.App.2d at pp. 165-166, 73 Cal.Rptr. 727 [prosecution witness characterized as a "mental defective" by trial judge was not incompetent despite his conflicting and inconsistent testimony]; People v. Scaggs (1957) 153 Cal-App.2d 354, 314 P.2d 793 [record did not disclose that witness who was described as senile and of unsound mind was incompetent as a matter of law].) Consistent with Pridgon's diagnosis of having the intellect of a seven year old, he expressed difficulty with complex questions and often responded in incomplete, sometimes nonsensical, sentences. Mere difficulty in understanding a witness, however, does not disqualify that witness under Evidence Code section 701, subdivision (a). To the extent defendant contends Pridgon's responses were unbelievable including his testimony that he "heard" blood and knew how money "sounds"this was an issue of credibility for the jury and not relevant to the issue of Pridgon's competency. (See Adamson v. Department of Social Services (1988) 207 Cal.App.3d 14, 20, 254 Cal.Rptr. 667.) "`Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citations.]'" (People v. Jones, supra, 268 Cal.App.2d at p. 165, 73 Cal.Rptr. 727.)
Moreover, the fact that Pridgon initially refused to answer defendant's question regarding Simms's strangulation did not establish by a preponderance of the evidence that he did not understand the duty to tell the truth. (Evid.Code, § 701, subd. (a)(2).) After Pridgon's refusals to answer, defense counsel asserted that "I think [Pridgon's] lying right now." This, however, is a question of credibility for the jury as trier of fact. (See Evid.Code, § 780, subd. (a) [witness's "demeanor while testifying and the manner in which he testifies" may be relevant to credibility].)
In sum, even assuming that defendant properly objected to Pridgon's competency to testify, there was no substantial basis for the trial court to exclude Pridgon's testimony on this ground. (Evid.Code, § 701, subd. (a).) Moreover, the record supports that the trial court would have rejected defendant's challenges to Pridgon's competency. Thus, we also reject defendant's claim of ineffective assistance of counsel based on counsel's failure to object to Pridgon's lack of competency. Where "there was no sound legal basis for objection, counsel's failure to object to the admission of the evidence cannot establish *297 ineffective assistance." (People v. Cudjo, supra, 6 Cal.4th at p. 616, 25 Cal.Rptr.2d 390, 863 P.2d 635.)

c. Instructional Errors
Defendant did not request an instruction that Pridgon's capacity to perceive and recollect was a preliminary fact that the jury must find before it may consider Pridgon's testimony. (Evid.Code, § 403, subds.(a)(2), (c)(1).) However, defendant maintains that the trial court should have given this instruction sua sponte. In addition, defendant argues that the trial court should have "subsequently determine[d]" that Pridgon's personal knowledge was not proven as a preliminary fact, and therefore should have instructed the jury to disregard his testimony. (Evid. Code, § 403, subd. (c)(2).) We discuss each issue in turn.
Under Evidence Code section 403, subdivision (c)(1), if the court admits evidence subject to the existence of a preliminary fact, the court "[m]ay, and on request shall, instruct the jury to determine whether the preliminary fact exists and to disregard the proffered evidence unless the jury finds that the preliminary fact does exist." On its own terms, this provision makes it discretionary for the trial court to give an instruction regarding a preliminary fact unless the party makes a request. Because defendant failed to do so, the trial court was not required to instruct the jury that Pridgon's capacity to perceive and recollect was a preliminary fact before the jury could consider his testimony. (Evid.Code § 403, subd. (c)(1).)
Nor was the trial court required to instruct the jury sua sponte. Contrary to defendant's contention, his challenge to Pridgon's capacity to perceive and recollect was not a defense per se or a theory of his case, but an evidentiary issue serving to limit Pridgon's testimony. Thus, the cases upon which defendant relies are inapposite. (See, e.g., People v. Sedeno (1974) 10 Cal.3d 703, 720, 112 Cal.Rptr. 1, 518 P.2d 913 [sua sponte duty to instruct on involuntary manslaughter upon evidence of diminished capacity]; People v. St. Martin (1970) 1 Cal.3d 524, 531, 83 Cal.Rptr. 166, 463 P.2d 390 [sua sponte duty to instruct on issue of provocation]; People v. Splawn (1985) 165 Cal.App.3d 553, 559, 211 Cal.Rptr. 638 [sua sponte duty to instruct on lesser included offense of attempted disposal of insured property with intent to defraud].) Indeed, the foregoing distinction is underscored by the purpose for this Evidence Code section 403, subdivision (c)(1), instruction in this case. Defendant's proposed sua sponte instruction would merely have told the jury the obvious: that if it found Pridgon could not perceive or recollect, i.e., that he hallucinated the murder and robbery, then the jury should disregard his testimony. Our faith in the common sense of jurors weighs against requiring a trial court to give such instruction sua sponte.
We also reject defendant's contention that the trial court should have subsequently instructed the jury to disregard Pridgon's testimony because the "jury could not reasonably find that the preliminary fact [of Pridgon's capacity to perceive and recollect] exists." (Evid.Code, § 403, subd. (c)(2).) Contrary to defendant's suggestion, we cannot conclude that "no reasonable person could find that [Pridgon] had personal knowledge of the circumstances," such that the trial court should have excluded his testimony as a matter of law. (People v. Blagg (1970) 10 Cal. App.3d 1035, 1039, 89 Cal.Rptr. 446; Evid. Code, § 403, subd. (c)(2).)
Based on testimony of both prosecution and defense expert witnesses, the record reflects that Pridgon did not suffer from *298 severe mental defects which substantially affected his testimony, or that Pridgon's cocaine use substantially interfered with his ability to perceive and recollect. Further, there was no evidence as to exactly when Pridgon stopped taking the major tranquilizer Mellaril, or that he would otherwise experience hallucinations without taking the medication, from which to infer that Pridgon experienced hallucinations on the day of the murder, as defendant contends. Regarding defendant's claim that Pridgon confabulated Simms's strangulation after he overheard the pathologist testify, Pridgon made gestures at the preliminary hearing indicating that he saw defendant strangle Simms before the pathologist testified. Moreover, Pridgon's failure to mention the strangling to Detective Sanchez or Lorene Allen may have been based on the detective's failure to include this in his report, and on Allen's statement that she did not want to know anything about the murder, which would cause Pridgon not to give her further details. Indeed, when the prosecution read the excerpt from the detective's report, which did not contain details of the strangling, Pridgon interjected that he recalled that defendant bent over Simms, put both hands on her neck, and attempted to strangle her before taking her money.
In addition, Pridgon's statement that he was "tired of my people getting killed" was not a delusional belief Pridgon had that he was a protector of an unidentifiable group. Rather, it was a statement reasonably interpreted that Pridgon, who was a Black man, was tired of fellow Black people, like Simms, getting killed. Moreover, Pridgon's statement that he was attempting to help Simms by falling on his bad knee was not inconsistent with his preliminary hearing testimony, and he eventually reaffirmed this statement during cross-examination. Finally, Pridgon's inability to tell time, including the exact time of the murder, would be consistent with his having the intellect of a seven year old.
In short, we conclude that the trial court did not err by failing to sua sponte instruct the jury regarding Pridgon's capacity to perceive and recollect as a preliminary fact (see Evid.Code, § 403, subd. (c)(1)), or by failing to instruct the jury to disregard Pridgon's testimony. (Evid.Code, § 403, subd. (c)(2).) Thus, we reject defendant's constitutional claims in this regard. For similar reasons, we reject defendant's claim of ineffective assistance of counsel for failure to request such instructions. Because there was no reasonable likelihood of prejudice in that the instructions would not have provided necessary guidance to the jurors, we need not determine whether counsel's performance was deficient. (People v. Cox (1991) 53 Cal.3d 618, 656, 280 Cal.Rptr. 692, 809 P.2d 351 [two-pronged test for ineffective assistance of counsel claim].)

3. Motion for New Trial
After the jury returned its verdicts, defendant moved for a new trial claiming that Pridgon's testimony was unreliable, and therefore, the verdict was "contrary to . . . evidence" under section 1181, subdivision 6. The trial court denied defendant's motion, finding substantial evidence that supported the fact that defendant committed the murder. The court found that irrespective of Pridgon's impeachment, the witnesses and evidence pointed to defendant as the killer; this included Pridgon as an eyewitness, defendant's motive to kill Simms, Pridgon's lack of a motive to kill Simms, and the tennis shoes containing blood consistent with Simms's, which were linked to defendant.
Defendant argues that the trial court should have granted his motion for a new trial because the evidence supporting the *299 guilty verdict was insufficient given Pridgon's incompetent testimony, which was not independently corroborated. Defendant points out that the tennis shoes did not implicate defendant, but rather Pridgon. He emphasizes that the prosecution's criminologist could not determine the source of the bloodstains. Moreover, he claims he did not ask for the tennis shoes, but rather Detective Sanchez handed them to him when he was arrested. A shoe store owner testified that the tennis shoes, which were women's shoes, fit Pridgon better than they fit defendant. Defendant argues that the trial court should have evaluated Pridgon's testimony with "great caution," because his testimony was crucial to the prosecution's case, and in particular, because Pridgon suffered from mental defects. (See People v. McCaughan, supra, 49 Cal.2d at p. 421, 317 P.2d 974; People v. St. Andrew (1980) 101 Cal. App.3d 450, 459, 161 Cal.Rptr. 634.)
On a motion for a new trial, a trial court must review the evidence independently, considering the proper weight to be afforded to the evidence, and then deciding whether there is sufficient credible evidence to support the verdict. (People v. Davis (1995) 10 Cal.4th 463, 524, 41 Cal. Rptr.2d 826, 896 P.2d 119.) "A trial court's ruling on a motion for new trial is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion. [Citation.]" (People v. Hayes (1999) 21 Cal.4th 1211, 1260-1261, 91 Cal.Rptr.2d 211, 989 P.2d 645.)
Based on our review of the record, we find no abuse of discretion. The record reflects that Pridgon had personal knowledge of the crime, which included his capacity to perceive and recollect. (See ante, 110 Cal.Rptr.2d at pp. 294-295, 28 P.3d at pp. 52-53.) Moreover, contrary to defendant's contention, evidence corroborated Pridgon's testimony. The pathologist confirmed Pridgon's description of the murder and how it took place. Pridgon also led detectives to the murder weapon, which indicated that he witnessed the murder. Moreover, Detective Sanchez testified that when he asked defendant to get his shoes when he was arrested, defendant pointed to the tennis shoes in question. Boggs also recalled that defendant wore white tennis shoes which were below the ankle when he was arrested, and that he had no other shoes besides them. Also, blood tests on the shoes revealed that at least one spot was human blood, and consistent with Simms's blood PGM type: two-plus, two-minus. The Attorney General also points out that defendant, unlike Pridgon, had a motive to kill and rob Simms because he had no money. He also had the motive to kill to avoid returning the money Simms gave him to purchase drugs, and to silence her nagging about his returning her money. Moreover, assuming the trial court had a duty to exercise great caution in viewing Pridgon's testimony, there is nothing in the record to show that the court failed to do so.
We also reject defendant's contention that the evidence was insufficient to support the verdict. For challenges relating to the sufficiency of the evidence, "the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidenceevidence that is reasonable, credible and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.]" (People v. Kraft (2000) 23 Cal.4th 978, 1053, 99 Cal.Rptr.2d 1, 5 P.3d 68.) Here, as explained, the evidence was sufficient. Thus, we conclude that the trial court's denial of defendant's *300 motion for a new trial did not result in an abuse of discretion. (See People v. Hayes, supra, 21 Cal.4th at pp. 1260-1261, 91 Cal.Rptr.2d 211, 989 P.2d 645.)

4. Robbery Special Circumstance
In his motion for a new trial, defendant alternatively requested that the trial court strike the robbery special circumstance (§ 190.2, subd. (a)(17)(A)), which the jury had found true. Defendant argued that based on the crucial but unreliable testimony of Pridgon, the special circumstance was unsupported by evidence. Denying his motion, the trial court declined to reconcile inconsistencies in Pridgon's testimony, including the fact that money was found on Simms's person. The court rejected defendant's contention that Pridgon had hallucinated the death and manner of killing Simms. The court was "satisfied beyond a reasonable doubt" under section 211 that defendant killed Simms while engaged in the commission of robbery. On appeal, defendant asserts that substantial evidence does not support the robbery special circumstance, and argues that the trial court otherwise implicitly concluded that defendant had not committed a robbery. We discuss each point in turn.
Substantial evidence must support a special circumstance finding. (People v. Jenkins, supra, 22 Cal.4th at p. 1022, 95 Cal.Rptr.2d 377, 997 P.2d 1044.) "In reviewing the sufficiency of evidence for a special circumstance, the question we ask is whether, after viewing the evidence in the light most favorable to the People, any rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt." (People v. Mickey (1991) 54 Cal.3d 612, 678, 286 Cal.Rptr. 801, 818 P.2d 84.) We find the record contains substantial evidence that defendant murdered Simms while engaged in the commission of a robbery.
After Pridgon testified that defendant had pressed on Simms's throat and reached into her blouse after striking her, the following colloquy took place:
"Q[uestion by the prosecution:] And what did you see when you say he went in the blouse?
"A[nswer by Pridgon:] He came out with some money.
"Q[:] Were you able to tell exactly how much money?
"A[:] No, I can't tell how much it was, but I knew it was a lot of money.
"Q[:] And can youwere you able to tell if it was coins or paper?
"A[:] It was paper.
"Q[:] From what you could see, did it appear to be more than one piece of paper money or just one piece?
"A[] He came out with a lot of money.
"Q[:]'He came out'
"A[:] With a handful of money.
"Q[:] `A handful'?
"A[:] Hum.
"Q[:] Now, you've been gesturing with your hand to thethe breast area on your body. Is that where you saw him reach in and come out with the money?
"A[:] Yes.
"Q[:] What's the next thing that happened after you saw him come out with the money?
"A[:] He got off of her.
"Q[:] And then what happened?
"A[:J Then he grabbed me and said if I say something, he's going to kill me."
In addition, when the prosecution asked whether defendant had ever mentioned wanting to hit Simms and take money from her, Pridgon answered, "Yes. [¶] He *301 say he know where a prostitute at that got money. . . . He asked me if I'm down for taking the money. [¶] I don't quite understand what he was saying. And I told him, `Yeah.' I didn't understand what he said. But when he repeat over again, I told him, `No. I don't do that kind of stuff.' [¶] . . . He said, "Well, I do it my damn self.'"
There was also circumstantial evidence that defendant robbed Simms. Defendant admitted he had seen Simms keep money in her bra. Physical evidence also showed that the top of Simms's blouse was ripped open, revealing her brassiere containing a folded $20 bill, and that buttons that had come from Simms's blouse lay near her body. There was evidence that Simms had recently cashed a paycheck and that she normally set aside money for rent from the paycheck and used the rest to purchase crack. Based on these facts, a reasonable trier of fact could conclude that defendant robbed Simms. As discussed previously, we reject defendant's contention that the trial court should have disregarded Pridgon's testimony as inherently unreliable. (See ante, 110 Cal.Rptr.2d at p. 299, 28 P.3d at p. 57.)
We also reject defendant's claim that the trial court implicitly foreclosed the finding of robbery based on the court's observation that "[although somewhat illogical, the apparent motive of the murder was to obviate the necessity of the defendant returning money to the victim which had been given to the defendant for the purpose of purchasing drugs." In other words, defendant did not kill Simms intending to rob her, but killed her to avoid paying a debt. As further evidence that he did not rob Simms, defendant states he did not take money from her person, which is supported by the fact that $20 was found on Simms's body.
Contrary to defendant's suggestion, the trial court's observation that defendant may have had the motive to kill Simms to cancel a debt he owed her does not preclude the finding of the robbery special circumstance. (See People v. Kraft, supra, 23 Cal.4th at p. 1053, 99 Cal.Rptr.2d 1, 5 P.3d 68 ["appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence"].) Although the record may have supported both theories, it was up to the trier of fact to determine whether or not defendant committed the robbery beyond a reasonable doubt. (People v. Mayfield (1997) 14 Cal.4th 668, 791, 60 Cal.Rptr.2d 1, 928 P.2d 485.) Indeed, the trial court, upon denying defendant's motion for a new trial or alternatively to strike the robbery special circumstance, independently reviewed the sufficiency of the evidence and credited Pridgon's testimony "on the fact that the Defendant killed Sandra Simms and took money from her person at the time of the killing," and "that the Defendant Raymond Lewis told him that he intended to hit the victim and take her money."
"`"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]"'" (People v. Kraft, supra, 23 Cal.4th at p. 1054, 99 Cal.Rptr.2d 1, 5 P.3d 68.) As noted, the record reveals substantial evidence from which a reasonable trier of fact could conclude that defendant robbed and murdered Simms. Thus, a reversal of the robbery special-circumstance finding was not warranted. (People v. Kraft, supra, 23 Cal.4th at p. 1054, 99 Cal.Rptr.2d 1, 5 P.3d 68.) Accordingly, we reject defendant's claim that his sentence violates the federal constitutional prohibition against arbitrary and capricious action.

*302 5. Claims Relating to Accomplice Liability

Defendant claims the trial court prejudicially erred by refusing to instruct the jury on accomplice liability and testimony regarding prosecution witness, Pridgon. (§ 1111;[5] CALJIC Nos. 3.10, 3.11, 3.12, 3.14, 3.16.) Because the testimony implicating defendant in the crimes was from an accomplice, the trial court should have instructed the jury that the testimony must be independently corroborated by evidence connecting defendant to the crimes. Based on the trial court's failure to do so, defendant maintains his conviction rests on uncorroborated accomplice testimony proscribed by section 1111.
Under section 1111, an accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." To be chargeable with an identical offense, a witness must be considered a principal under section 31.[6](People v. Horton (1995) 11 Cal.4th 1068, 1113-1114, 47 Cal. Rptr.2d 516, 906 P.2d 478; but see id. at p. 1114, 47 Cal.Rptr.2d 516, 906 P.2d 478 [a mere accessory is not an accomplice].) An accomplice must have "`guilty knowledge and intent with regard to the commission of the crime.'" (People v. Hoover (1974) 12 Cal.3d 875, 879, 117 Cal.Rptr. 672, 528 P.2d 760.)
"If there is evidence from which the jury could find that a witness is an accomplice to the crime charged, the court must instruct the jury on accomplice testimony. [Citation.] But if the evidence is insufficient as a matter of law to support a finding that a witness is an accomplice, the trial court may make that determination and, in that situation, need not instruct the jury on accomplice testimony. [Citation.]" (People v. Horton, supra, 11 Cal.4th at p. 1114, 47 Cal.Rptr.2d 516, 906 P.2d 478; accord, People v. Hoover, supra, 12 Cal.3d at p. 880, 117 Cal.Rptr. 672, 528 P.2d 760 ["`Whether the facts with respect to the participation of a witness in the crime for which the accused is on trial are clear and not disputed, it is for the court to determine whether he is an accomplice'"].)
Defendant proffered evidence that Pridgon was at the crime scene, he had intimate knowledge of the crimes beyond that of a mere bystander, he had a habit of carrying sticks or boards, and he had a reputation for dishonesty. Defendant also points to testimony from a shoe store owner that the bloody shoes fit Pridgon better than they fit defendant, evidence of Pridgon's history of mental illness and auditory hallucinations, which may have caused him to kill Simms, and Pridgon's inconsistent and "evasive" testimony. He also postulates that based on the fact that Simms was struck on the left side of her face, Simms must have been struck by a left-handed person like Pridgon, and not defendant, who is right-handed. Defendant argues the foregoing evidence constituted disputed facts on the issue of accomplice liability, a question of fact which the trial court should have submitted to the jury.
We find no error. Defendant's evidence supporting the request for accomplice instructions was not substantial but speculative. Substantial evidence is "evidence *303 sufficient to `deserve consideration by the jury,' not `whenever any evidence is presented, no matter how weak.'" [People v. Williams (1992) 4 Cal.4th 354, 361, 14 Cal.Rptr.2d 441, 841 P.2d 961.) Although Pridgon was at the scene of the crime and had intimate knowledge of the robbery and murder, this fact without more merely means that he was an eyewitness and not necessarily an accomplice to the crimes. (See People v. Stankewitz (1990) 51 Cal.3d 72, 90, 270 Cal.Rptr. 817, 793 P.2d 23.) There was no admissible evidenceapart from evidence that Pridgon may have kicked and bit a police officer who called him derogatory names of his violent, assaultive behavior. Defendant also presented no evidence that Pridgon used the sticks or boards he carried as weapons to assault people. In short, the evidence relating to Pridgon's motive to commit the crimes was speculative. Although defendant is correct that motive is not an element of the crimes and thus is not indispensably necessary for conviction, "[m]otive is an intermediate fact which may be probative of such ultimate issues as intent [citation], identity [citation], or commission of the criminal act itself [citation]." (People v. Scheer (1998) 68 Cal. App.4th 1009, 1017-1018, 80 Cal.Rptr.2d 676.)
Moreover, the evidence relating to the bloody tennis shoes did not support giving accomplice instructions. Although at trial defendant asserted that Pridgon, who was in defendant's room the night of the murder, may have planted the shoes or that defendant was confused when he pointed to the shoes, defendant failed to show any evidence supporting these assertions. Moreover, even the shoe store owner's testimony was ambiguous. Although the owner said that the tennis shoes fit Pridgon better than they fit defendant, he did not state the shoes actually fit either defendant or Pridgon, and defendant was still able to wear the shoes. In addition, defendant's argument that Pridgon was left-handed and, as such, was more likely the one to have hit Simms on the left side of her head, was speculative and not dictated by the evidence. In short, there was no evidence other than speculation that Pridgon planned, encouraged or instigated the murder and robbery to give rise to accomplice liability. (People v. Horton, supra, 11 Cal.4th at p. 1115, 47 Cal.Rptr.2d 516, 906 P.2d 478; see also § 31.) Contrary to defendant's suggestion, evidence tending to negate his own guilt, including his denial that he owned the tennis shoes and his alleged lack of motive to commit the crimes, would not necessarily lead to the conclusion that Pridgon was an accomplice.
Even assuming the trial court erred by failing to give accomplice instructions, we find the error to be harmless. A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is sufficient corroborating evidence in the record. (People v. Hayes, supra, 21 Cal.4th at p. 1271, 91 Cal. Rptr.2d 211, 989 P.2d 645.) "Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense. [Citations.]" (Ibid.) The evidence "is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." (People v. Fauber (1992) 2 Cal.4th 792, 834, 9 Cal.Rptr.2d 24, 831 P.2d 249.)
Pridgon's testimony was sufficiently corroborated. As discussed, Detective Sanchez testified that defendant pointed to the bloody tennis shoes as his, and tests later confirmed that a bloodstain on one shoe was consistent with Simms's PGM type. Based on her refreshed recollection, *304 Boggs testified that the shoes the police took when they arrested defendant were defendant's, and that he had no other shoes besides those. Also, Pridgon's description of how Simms's murder took place was corroborated by the pathologist.
To the extent defendant argues the jury should have been instructed to view Pridgon's testimony with distrust (CALJIC No. 3.18), we find the other instructions givenincluding "[a] witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others" (CALJIC No. 2.21.2), along with instructions on a witness's credibility (CALJIC No. 2.20) and the character of a witness for honesty or truthfulness or their opposites (CALJIC No. 2.24)were sufficient to inform the jury to view Pridgon's testimony with care and caution, in line with CALJIC No. 3.18. Indeed, the prosecution informed the jury during closing argument of Pridgon's prior convictions and told the jury to consider whether his testimony was truthful in view of the physical evidence and other witnesses' testimony. Emphasizing Pridgon's possible involvement in the murder, the defense argued that Pridgon was at the scene of the crime and "either did it himself or watched someone else do it or may have somehow assisted in the particular murder. The problem is that with Paul's record of falsity and Paul's record of mental problems we can't know exactly what his contribution was." Thus, we conclude there was no reasonable probability that defendant would have received a more favorable result if the trial court instructed the jury to view Pridgon's testimony with distrust. (People v. Watson (1956) 46 Cal.2d 818, 837, 299 P.2d 243.) Indeed, defendant did not contend that Pridgon helped him commit the crimes, nor was there evidence they were working together. Thus, the instructions requested would have informed the jury to view Pridgon's testimony with distrust if the jury determined that Pridgonand not defendant committed the crimes. Any reasonable juror would reach this conclusion without instruction.
Notwithstanding defendant's citation of federal and state Court of Appeal cases, we have observed that "[n]o cases have held failure to instruct on the law of accomplices to be reversible error per se." (People v. Gordon (1973) 10 Cal.3d 460, 470, 110 Cal.Rptr. 906, 516 P.2d 298.) Because we find no error and otherwise find any error to be harmless, we accordingly reject defendant's federal constitutional claims that the court's failure to instruct on accomplice liability violated his right to a trial by jury, to due process, and to present a defense protected by the Sixth and Fourteenth Amendments, and his right to a reliable conviction for a capital offense under the Eighth and Fourteenth Amendments, and deprived him of a reliable, individualized capital sentencing determination guaranteed by the Eighth Amendment.

6. Third Party Culpability
In support of a third party culpability defense that Pridgon, and not defendant, committed the crimes, defendant proffered evidence that Pridgon struck five people in three incidents between 1983 and 1985. The incidents included Pridgon punching and slapping one girl, and slapping two other girls, who accused him of stealing one of the girls' headset; pulling sunglasses off a girl's face and breaking them after being told to sit down and be quiet on a school bus; and striking a detective when he interviewed Pridgon about his involvement and alibi in a reported arson.
Defendant argued this evidence raised the inference that Pridgon had a motive and predisposition to rob and kill *305 Simms. These incidents showed that when Pridgon is "frustrated" or is confronted with "[a]nything he doesn't like, he attacks people physically, and that he has a propensity for violence." Thus, in conjunction with circumstantial evidence linking Pridgon to the crimes, defendant claimed Pridgon was "more likely" the one who committed the crimes. The trial court excluded the evidence. Determining that the prejudicial effect of evidence of Pridgon's prior physical attacks substantially outweighed its probative value, the trial court ruled this evidence of third party culpability was inadmissible under People v. Hall (1986) 41 Cal.3d 826, 226 Cal. Rptr. 112, 718 P.2d 99. Defendant claims that by finding the proffered evidence "just raises speculative issues," the trial court erred by making a determination that is within "the province of the jury." (People v. Hall, supra, 41 Cal.3d at p. 834, 226 Cal.Rptr. 112, 718 P.2d 99.)
"To be admissible, the third-party evidence need not show `substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (People v. Hall, supra, 41 Cal.3d at p. 833, 226 Cal.Rptr. 112, 718 P.2d 99.) We emphasized that "courts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible ([Evid.Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion ([Evid.Code,] § 352)."[7](People v. Hall, supra, 41 Cal.3d at p. 834, 226 Cal. Rptr. 112, 718 P.2d 99.) A trial court's discretionary ruling under Evidence Code section 352 will not be disturbed on appeal absent an abuse of discretion. (People v. Alvarez (1996) 14 Cal.4th 155, 201, 58 Cal.Rptr.2d 385, 926 P.2d 365.)
We find no abuse of discretion. Although defendant asserted the prior acts of violence showed Pridgon attacked "[a]nything he didn't like" or attacked when he was frustrated, there was no evidence or suggestion that Pridgon was frustrated or that he did not like Simms, whom he met for the first time the night she was killed. Moreover, Pridgon's prior acts were remote not only in time, but also in pattern, to the present crimes. (See People v. Hall, supra, 41 Cal.3d at p. 833, 226 Cal.Rptr. 112, 718 P.2d 99.) They did not involve victims or methods of attack similar to the present crimes. The trial court reasonably found the evidence was too speculative to be relevant. In view of the prejudicial impact, undue consumption of time, and possible confusion of issues, the trial court properly determined that evidence of Pridgon's prior acts of violence was inadmissible under Evidence Code section 352. Contrary to defendant's contention, the trial court's determination that the evidence presented only speculative issues did not invade the jury's province. (People v. Hall, supra, 41 Cal.3d at p. 834, 226 Cal.Rptr. 112, 718 P.2d 99.) The trial court simply made a threshold evidentiary ruling to exclude speculative evidence, the *306 probative value of which did not outweigh its prejudicial effect. (Ibid.; see also People v. Babbitt (1988) 45 Cal.3d 660, 682, 248 Cal.Rptr. 69, 755 P.2d 253 [evidence is irrelevant if it produces only speculative inferences].)
Indeed, defendant's assertion that these prior acts would show that Pridgon "had a propensity for violence," undercuts his position that the evidence should have been admitted. (See Evid.Code, § 1101, subd. (a) [character evidence is inadmissible to prove a person's conduct on a specified occasion].) "The inference of a criminal disposition may not be used to establish any link in the chain of logic connecting the uncharged offense with a material fact. If no theory of relevancy can be established without this pitfall, the evidence of the uncharged offense is simply inadmissible." (People v. Thompson (1980) 27 Cal.3d 303, 317, 165 Cal.Rptr. 289, 611 P.2d 883.) As discussed, defendant fails to establish how, apart from suggesting Pridgon's "criminal disposition," Pridgon's prior acts of violence connected him to the present crimes. (Ibid.) Thus, this evidence was inadmissible.
Accordingly, we reject defendant's claims under the federal Constitution that the trial court's exclusion of the third party culpability defense violated his Sixth and Fourteenth Amendment rights to present a complete defense, his Eighth and Fourteenth Amendment rights to a reliable conviction for a capital offense, and his Eighth Amendment right to a reliable, individualized capital sentencing determination.

7. Other Evidentiary Issues

a. Evidence to Impeach Prosecution Witnesses
To establish bias, defendant proffered evidence that three witnesses (Lorene Allen, Betty Thomas, and Jimmy Woods) lived with Pridgon and lived off Pridgon's $700 Supplemental Security Income (SSI) check each month. Defendant maintains that this evidence would show that these individuals had a monetary interest in protecting Pridgon because if Pridgon were incarcerated, he would no longer receive SSI checks, and they, too, would receive no money. The trial court sustained the objections to this impeachment evidence, ruling the prejudicial effect of this evidence outweighed any probative value.
Defendant also sought unsuccessfully to introduce evidence and to cross-examine Pridgon on certain issues to undermine his credibility. The trial court sustained the objection to the question to Pridgon whether Dr. Kinsey, who had prescribed Mellaril to him, called his mother asking Pridgon to return to see him. The trial court excluded the testimony and notes of a psychiatric technician who had interviewed Pridgon on June 24, 1987. Defendant also requested to have a psychiatrist or psychologist in the courtroom while Pridgon testified to determine whether Pridgon had the capacity to perceive and recollect. However, before the court could rule, trial counsel withdrew his request stating, "I just mooted [the issue]." The trial court also sustained objections to questions whether Pridgon ever hit anyone with a stick, and whether he ever carried a knife at night for protection. And the trial court prevented the defense from asking Pridgon whether he threatened to strangle defense counsel. Defendant contends the trial court committed error based on these rulings.
"Under Evidence Code section 352, the trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.]" (People v. *307 Rodrigues (1994) 8 Cal.4th 1060, 1124, 36 Cal.Rptr.2d 235, 885 P.2d 1.) A trial court's discretionary ruling under Evidence Code section 352 will not be disturbed on appeal absent an abuse of discretion. (People v. Alvarez, supra, 14 Cal.4th at p. 201, 58 Cal.Rptr.2d 385, 926 P.2d 365.) "`[T]he latitude section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues.' [Citation.]" (People v. Ayala (2000) 23 Cal.4th 225, 301, 96 Cal.Rptr.2d 682, 1 P.3d 3.) Regarding constitutional limitations, we have held that "`not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance.' [Citation.]" (Ibid.)
Applying the foregoing standard, we find no abuse of discretion. The probative value of the evidence that Allen, Thomas, and Woods received money from Pridgon was minimal because Pridgon testified at the preliminary hearing that he told Allen to help pay for rent when she got a job and told Woods either to help pay rent or to clean up. Thus, their financial dependence was not without limits. Further, any evidence of their bias in protecting Pridgon was already introduced because the record showed that the apartment where these individuals lived belonged to Pridgon, and that there was a preexisting, somewhat familial relationship between them, i.e., Pridgon sometimes called Allen "Mom," and Thomas had known Pridgon for eight years. The trial court also reasonably excluded evidence that Pridgon had said he wanted to strangle defense counsel. The prejudicial effect of this evidence outweighed any probative effect this evidence may have had on Pridgon's credibility or bias toward defendant.
The trial court also properly limited questions to Pridgon about whether he ever hit anyone with a stick or whether he ever carried a knife for protection. These questions were unlimited in time and of marginal relevance. However, defendant was permitted to question Pridgon as to whether he hit Simms with a stick and whether he cut Simms with a knife, to which questions Pridgon replied in the negative.
Moreover, defendant's question to Pridgon whether Dr. Kinsey phoned his mother to have Pridgon see him, and testimony from the psychiatric technician were properly excluded because the testimony would have been repetitive. Dr. Kinsey later testified regarding Pridgon's visits and missed appointments. Also, the technician's proposed testimony and her notes regarding Pridgon's mental state in 1987 had already been introduced through other expert witnesses. Contrary to defendant's contention, the trial court did not err by limiting the questioning and excluding the evidence.
Finally, defense counsel withdrew his request for a psychiatrist or psychologist to be present during Pridgon's testimony, thus precluding any cognizable appellate claim that trial court abused its discretion on this evidentiary issue. "[T]he absence of an adverse ruling precludes any appellate challenge." (People v. McPeters (1992) 2 Cal.4th 1148, 1179, 9 Cal.Rptr.2d 834, 832 P.2d 146.) Moreover, the jury heard ample expert evidence regarding Pridgon, and observed Pridgon firsthand as he testified. Thus, even without additional expert testimony, the jury was sufficiently equipped to make its ultimate decision on Pridgon's capacity to perceive and recollect. (See People v. *308 Anderson, supra, 25 Cal.4th at p. 576, 106 Cal.Rptr.2d 575, 22 P.3d 347 [observing that psychiatric testimony would be less useful on issues relating to a witness's competency or credibility where the trier of fact on its own could evaluate the witness's demeanor and responses in view of evidence presented].)

b. Evidence to Impeach Defendant
Over defendant's hearsay objection, Investigator Bennett testified that Boggs told her that she was surprised defendant had crack cocaine since he did not have any money, which statement tended to show defendant had a motive to rob and kill Simms. Defendant argues this statement prejudiced him because it directly contradicted the defense's case on this issue.
We find no error. Although hearsay, this statement was admissible under the hearsay exception for inconsistent statements under Evidence Code section 1235. Boggs previously testified that defendant never told her he had no money, and that she did not recall whether she told the police that she told Simms that defendant wanted the $10 Simms owed him because he had no money.
Because we find no error, we accordingly reject defendant's contentions that the foregoing exclusion and admission of evidence violated his various constitutional rights.

B. Penalty Phase

1. Claims Relating to the 1975 Murder of A.Z. Rogers

a. Defendant's Knowledge of Wrongfulness Under Section 26
As a factor in aggravation under section 190.3, factor (b),[8] the prosecution introduced evidence that in 1975, when defendant was about 13 years 9 months old, he murdered A.Z. Rogers. Defendant, along with his two friends, poured gasoline and threw a lighted match into the car in which Rogers was sleeping. After making inconsistent statements, defendant eventually confessed to detectives that he had set Rogers on fire. Because defendant was a minor, he was tried in juvenile court, which found defendant committed the second degree murder of Rogers and adjudged defendant to be a ward of the court. Defendant was subsequently committed to the CYA. Evidence of his juvenile adjudication was not submitted to the jury.
Several witnesses testified regarding the circumstances of the 1975 murder. One witness testified she rescued the burning body of Rogers, who died from smoke inhalation and second and third degree burns over 95 percent of his body. A fire captain and a fire marshal who investigated the car fire both confirmed that the fire was not accidental, but that someone deliberately started it by using flammable fluid. Another witness said that she saw three people, including defendant, running away from the fire. Finally, Investigator Martin, who had interrogated defendant, testified that defendant confessed that he had thrown a lighted match into the car.
At trial, defendant moved to exclude evidence of Rogers's murder on the ground that there was no "clear proof that defendant knew the act's "wrongfulness" at the time he committed the act. Defendant also maintained that when he was interrogated he did not intelligently and knowingly waive his right to counsel, and that his confession was not voluntary. *309 Denying defendant's motion to exclude the evidence, the trial court stated it was up to the jury to determine beyond a reasonable doubt whether defendant knew the wrongfulness of his act. However, the court granted defendant's request that it make a preliminary finding to determine whether defendant's 1975 confession was voluntary and thus admissible. (Evid.Code, § 402, subd. (b) [upon party's request in a criminal action, the "court shall hear and determine" the admissibility of defendant's confession outside the jury's presence].) The trial court determined that defendant's confession was voluntary, and that he had made an intelligent and knowing waiver of his right to counsel. Indeed, when the trial court subsequently denied defendant's automatic motion to reduce the death verdict (Pen.Code, § 190.4, subd. (e)), the court stated it was "satisfied beyond any reasonable doubt" that defendant knew the wrongfulness of Rogers's murder at the time he had committed it.
On appeal, defendant argues that because there was no indication the juvenile court in 1975 found clear proof that defendant knew the wrongfulness of the murder, he lacked the capacity to commit the crime (Pen.Code, § 26); thus, evidence of Rogers's murder should not be considered criminal activity under Penal Code section 190.3, factor (b). As further support of his impaired understanding, defendant points out that at age 14 he was diagnosed a paranoid schizophrenic "with episodic violent behavior and borderline intelligence." Although the jury and trial court determined that defendant understood the wrongfulness of his act at the time of the 1975 murder, defendant maintains that it is inherently unfair and violates due process to make that determination nearly 16 years after the fact. Further, he argues that the trial court should have determined as a preliminary fact whether defendant knew the wrongfulness of his conduct before submitting evidence of Rogers's murder to the jury. (Evid.Code, § 403, subd. (a)(1).) Defendant also objects that the jury instructions were improper. We address each issue in turn.
Although juvenile adjudications do not qualify as prior convictions under section 190.3, factor (c), and may not be admitted during the penalty phase, evidence of juvenile criminal conduct may be considered as an aggravating factor. Prior violent juvenile misconduct, regardless of conviction, may be admitted as evidence of "criminal activity . . . which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (§ 190.3, factor (b); see also People v. Burton (1989) 48 Cal.3d 843, 862, 258 Cal.Rptr. 184, 771 P.2d 1270.)
Defendant, however, emphasizes the limitation of section 26. Section 26 provides in pertinent part: "All persons are capable of committing crimes except those belonging to the following classes: [11] OneChildren under the age of 14, in the absence of clear proof that at the time of committing the act charged against them, they knew its wrongfulness. . . ." (See In re Gladys R. (1970) 1 Cal.3d 855, 864, 83 Cal.Rptr. 671, 464 P.2d 127 ["Section 26 embodies a venerable truth, which is no less true for its extreme age, that a young child cannot be held to the same standard of criminal responsibility as his more experienced elders"].) However, "the presumption of a minor's incapacity [may] be rebutted by clear and convincing evidence" that the minor defendant knew the act's wrongfulness. (In re Manuel L. (1994) 7 Cal.4th 229, 238, 27 Cal.Rptr.2d 2, 865 P.2d 718.)
Although a minor's knowledge of wrongfulness may not be inferred from the commission of the act itself, "the attendant circumstances of the crime, such as its *310 preparation, the particular method of its commission, and its concealment" may be considered. (In re Tony C. (1978) 21 Cal.3d 888, 900, 148 Cal.Rptr. 366, 582 P.2d 957.) Moreover, a minor's "age is a basic and important consideration [citation], and, as recognized by the common law, it is only reasonable to expect that generally the older a child gets and the closer [he] approaches the age of 14, the more likely it is that [he] appreciates the wrongfulness of [his] acts." (In re Cindy E. (1978) 83 Cal.App.3d 393, 399, 147 Cal. Rptr. 812.)
Defendant argued both at trial and on appeal that the juvenile file did not disclose the juvenile court's finding that defendant knew the wrongfulness of his conduct pursuant to section 26. Assuming that the juvenile court did not make an express on-the-record inquiry regarding the minor's knowledge of wrongfulness and that it was error not to do so, we find any error to be harmless. There was substantial evidence supporting the finding that defendant knew the wrongfulness of his conduct at the time of the 1975 murder. (See In re Paul C. (1990) 221 Cal.App.3d 43, 52, 270 Cal.Rptr. 369 [reviewing court views evidence in light most favorable to respondent and presumes the existence of every fact the trier may deduce from the evidence in support of juvenile court order].)
Based on the circumstances that defendant was seen running away from the car, that defendant lied to Detective Lean about the cause of the fires on two occasions, and that defendant admitted to Investigator Martin that he struck a match and threw it in the car, the trial court was "satisfied beyond a reasonable doubt" that defendant appreciated the wrongfulness of his conduct. Defendant's flight from the scene and his conflicting statements to detectives constitute clear proof that defendant knew the wrongfulness of his act. (In re Gregory S. (1978) 85 Cal.App.3d 206, 212, 149 Cal.Rptr. 216.) Moreover, at the time of the murder defendant was nearly 14 years old, which makes it more likely that he understood the wrongfulness of his act. (In re Cindy E., supra, 83 Cal.App.3d at p. 399, 147 Cal.Rptr. 812.) In view of the more stringent reasonable doubt standard the trial court used, we do not find persuasive defendant's unsupported contention that the trial court did not give due consideration to his mental illness and troubled past. (See In re Paul C, supra, 221 Cal.App.3d at p. 52, 270 Cal.Rptr. 369.) To the contrary, the trial court considered both as factors in mitigation. Indeed, we would find it difficult to conclude that a 13 year old would not know it is wrong to douse a man with gasoline and throw a lighted match.
Noting that it is nearly impossible to "recreate the mental state" of a 13 year old 16 years later, defendant argues it is inherently unfair and violates due process that the jury and trial court here made this determination. We disagree. A trier of fact making a section 26 determination does not attempt to read the mind of the minor, but considers the objective attendant circumstances of the crime such as its preparation, the method of its commission, and its concealmentto determine whether the minor understood the wrongfulness of his or her conduct. (In re Tony C, supra, 21 Cal.3d at p. 900, 148 Cal.Rptr. 366, 582 P.2d 957.) "Reliance on circumstantial evidence is often inevitable when, as here, the issue is a state of mind such as knowledge." (Ibid.) Though deliberating nearly 16 years after Rogers's murder, the jury and trial court could ascertain the circumstances of the crime from the testimonial witnesses.
*311 Contrary to defendant's suggestion, the trial court ensured that defendant received a fair hearing on this matter. The trial court submitted the question to the jury and also imposed a reasonable doubt standard, which is more stringent than a clear proof standard under section 26. {In re Manuel L., supra, 7 Cal.4th at p. 234, 27 Cal.Rptr.2d 2, 865 P.2d 718.) The trial court itself also determined it was "satisfied beyond a reasonable doubt" that defendant knew the wrongfulness of his conduct.
We also reject defendant's related argument that the trial court should have determined that defendant's knowledge of wrongfulness was a preliminary fact that the trial court should have decided before submitting evidence of Rogers's murder to the jury. Assuming the trial court was required to do so, any failure by the court to make such finding as a "preliminary fact," as defendant contends, was harmless because the trial court later determined that defendant had known the wrongfulness of the act. Defendant fails to point to any prejudice based on this evidentiary sequence. Indeed, a trial court has discretion to "admit conditionally the proffered evidence . . . subject to evidence of the preliminary fact being supplied later in the course of the trial." (Evid.Code, § 403, subd. (b).) We reject defendant's unsupported claim that determining a minor's capacity under Penal Code section 26 should be considered the same as determining the admissibility of a confession as a foundational or preliminary fact. (Evid. Code, § 402, subd. (b) [upon a party's request, a court must first determine the admissibility of a confession or admission outside the presence and hearing of the jury].)
Finally, we reject defendant's claim that the jury instructions were improper because they merely mirrored the language of section 26 and did not specifically instruct the jury to consider the attendant circumstances of the crime, or defendant's age, experience, and understanding. (See In re Marven C. (1995) 33 Cal.App.4th 482, 487, 39 Cal.Rptr.2d 354.) The trial court instructed the jury to consider "such things as flight after the crime, giving conflicting statements to investigating officers, and closeness to the age of 14." These considerations were entirely proper. {In re Gregory S., supra, 85 Cal.App.3d at p. 212, 149 Cal.Rptr. 216; In re Cindy E., supra, 83 Cal. App.3d at p. 399, 147 Cal.Rptr. 812.) Indeed, defendant did not request further amplification or explanation of these instructions. As such, defendant may not complain about these instructions on appeal. (People v. Lang (1989) 49 Cal.3d 991, 1024, 264 Cal.Rptr. 386, 782 P.2d 627.)
Although defendant failed to object at trial, he also contends the jury instruction was argumentative in the prosecution's favor. (People v. Hines (1997) 15 Cal.4th 997, 1067-1068, 64 Cal.Rptr.2d 594, 938 P.2d 388.) A jury instruction is argumentative when it is "`of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence.' [Citations.]" (Ibid.) Although the instruction may have asked the jury to focus on evidence favorable to the prosecution, any error was harmless.
Both the prosecution and defense counsel, during closing arguments at the penalty phase, emphasized factors beyond those enumerated in the instruction. For instance, defense counsel stressed defendant's troubled childhood, his diagnosis of paranoid schizophrenia, and his lack of parental guidance. In light of defense counsel's closing argument, which presented *312 factors that defendant wanted the jury to consider, we do not find it reasonably likely that the jury applied the wrong criteria to determine whether defendant knew the wrongfulness of his conduct. (See People v. Kelly (1992) 1 Cal.4th 495, 525-527, 3 Cal.Rptr.2d 677, 822 P.2d 385.)

b. Defendant's Confession
At defendant's request, the trial court held a hearing to determine whether defendant's 1975 confession to Rogers's murder was admissible. After hearing testimony from defendant and Detective Lean and Investigator Martin, who had questioned defendant in 1975 regarding Rogers's death, the trial court was "satisfied that the Defendant made a voluntary, intelligent, and knowing waiver of his Constitutional rights, and that he voluntarily and intelligently and knowingly beyond a reasonable doubt consented to talk to the officers." Defendant contends the trial court erred by failing to consider defendant's lack of education, lack of experience with the police, and his young age, which indicated defendant's confession was not a product of his free will and his intelligent and knowing waiver of his Fifth Amendment rights. Defendant also argues the failure to readvise him of his rights under Miranda v. Arizona (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (Miranda) during a subsequent interview renders his confession inadmissible under the Fifth Amendment. We will discuss each issue in turn by first beginning with the facts.
On May 7, 1975, Detectives Lean and Christensen brought defendant and his friends Sylvester G. and Willis R.who were not arrested but under suspicion for Rogers's deathto the sheriffs department for questioning. Detective Lean testified that he advised defendant, without defendant's mother or an attorney present, of his rights under Miranda. Defendant waived his rights. Defendant then gave at least two inconsistent versions of what had happened. First, defendant told Detective Lean he last saw Rogers when Rogers was smoking a cigarette underneath the hood of his car. Defendant later found out from Sylvester G. that Rogers's car had caught on fire, presumably from Rogers's cigarette. During a second interview, after Detective Lean revealed that arson investigators determined the fire originated from inside the car and not from under the hood, defendant gave a different version of the facts. Defendant told Detective Lean that he and Sylvester G. were siphoning gas from Rogers's car when, while horsing around, defendant threw the gas can at Sylvester G., and it landed in Rogers's car. The car caught on fire after defendant accidentally knocked a cigarette out of Sylvester G.'s hand into the car.
To better communicate with defendant, Detective Lean asked Investigator Martin, who was a Black male, to interview defendant. In the meantime, Detectives Lean and Christensen stepped out of the room. Detective Lean went out about 5:00 p.m. to get dinner for defendant and his friends. Investigator Martin did not readvise defendant of his rights because he was advised that the sheriffs office had already done that. After defendant gave another inconsistent version of the facts, Investigator Martin told defendant he did not believe that defendant was being honest. Investigator Martin emphasized that Rogers was a "nice man" and "didn't deserve to die that way," and that "this was something that was horrible and won't go away." Defendant then admitted that he threw gas into the back seat of Rogers's car where Rogers was sleeping, struck a match, and threw it into the car, igniting a fire. Afterwards, defendant went home and "was feeling real bad." Defendant told Investigator Martin he did this because *313 Rogers had slapped him after he had tried to take Rogers's watch.
Detective Lean testified that after he read defendant his Miranda rights from a department-issued card, he asked whether defendant understood these rights and "[h]aving these rights in mind, do you wish to talk to us now?" Without any overt hesitation, defendant replied yes, and did not express any confusion over the rights read to him. Detective Lean also testified that before interviewing juveniles, he takes "great care" to ensure that they understand each right read; he tells them that he is open to questions, and that he will stop at any time they do not understand any wording and will explain it to them. Detective Lean took the same care before interviewing defendant. Defendant did not ask any questions, nor did he appear emotionally upset either before or during the interview. Detective Lean did not recall that defendant said he wanted to call his mother during the interview. Moreover, in his interview with defendant, Investigator Martin noted that defendant was mentally alert, relaxed, attentive, and that "[i]t was obvious that he understood what was going on." Investigator Martin was not asked whether defendant had requested to call his mother during his interview with defendant.
Defendant testified on his own behalf. He recalled telling detectives that Sylvester G. tried putting gas in Rogers's carburetor, but they both left after the car would not start. He also admitted he gave three or four different stories regarding what happened on April 28 because he was told Sylvester G. and Willis R. had made statements and he was confused. However, he denied telling detectives that he and Sylvester G. were splashing each other with gas, which landed in the car, or that he was wrestling with Sylvester G. and accidentally flipped a cigarette into the car, causing the fire. He also testified that he was afraid in the interviews; that although he was read his rights under Miranda, he did not know what "Constitutional rights," "exercising these rights," "lawyer," and "having a lawyer appointed" meant. Defendant also asserted he did not know he was not required to answer the detectives' questions. Contrary to Detective Lean's testimony, defendant testified that he was denied his request to talk to his mother before and after he gave his statement.

(i) Minor's Fifth Amendment Privilege
A minor has a Fifth Amendment privilege against self-incrimination, which precludes admission of a minor's confession obtained without the minor's voluntary, intelligent, and knowledgeable waiver of his or her constitutional rights. (In re Gault (1967) 387 U.S. 1, 55, 87 S.Ct. 1428, 18 L.Ed.2d 527; People v. Burton (1971) 6 Cal.3d 375, 383-384, 99 Cal.Rptr. 1, 491 P.2d 793.) To determine whether a minor's confession is voluntary, a court must look at the totality of circumstances, including the minor's age, intelligence, education, experience, and capacity to understand the meaning and consequences of the given statement. (In re Charles P. (1982) 134 Cal.App.3d 768, 771, 184 Cal. Rptr. 707; see also hi re Eduardo G. (1980) 108 Cal.App.3d 745, 756-757, 166 Cal.Rptr. 873.) "The decision to confess cannot be of itself an indicium of involuntariness in the complete absence of coercive circumstances." (In re Reginald B. (1977) 71 Cal.App.3d 398, 405, 139 Cal. Rptr. 465.) A court should look at whether the minor "was exposed to any form of coercion, threats, or promises of any kind, trickery or intimidation, or that he was questioned or prompted by . . . anyone else to change his mind." (In re Frank C. (1982) 138 Cal.App.3d 708, 714, 188 Cal. Rptr. 68.)
*314 On appeal, a reviewing court looks at the evidence independently to determine whether a defendant's confession was voluntary, but will uphold the trial court's findings of the circumstances surrounding the confession if supported by substantial evidence. {People v. Massie (1998) 19 Cal.4th 550, 576, 79 Cal.Rptr.2d 816, 967 P.2d 29; see also In re Anthony J. (1980) 107 Cal.App.3d 962, 971, 166 Cal. Rptr. 238 [burden to establish whether accused's statements are voluntary is greater if the accused is a juvenile rather than an adult].) However, if there is conflicting testimony on whether a defendant waived his Miranda rights, "we must accept that version of events which is most favorable to the People, to the extent that it is supported by the record." (People v. Jackson (1980) 28 Cal.3d 264, 300, 168 Cal.Rptr. 603, 618 P.2d 149.) We agree that defendant's confession was voluntary and followed a knowing and intelligent waiver of his Miranda rights.
Detective Lean's testimony, which the trial court clearly credited, supported the court's finding that defendant intelligently and knowingly waived his rights before voluntarily confessing. Indeed, neither Detective Lean's nor Investigator Martin's testimony was "`inherently so improbable as to be unworthy of belief.'" (Flowers v. State Personnel Bd. (1985) 174 Cal.App.3d 753, 759, 220 Cal.Rptr. 139.) We find the record supports the trial court's finding that defendant intelligently and knowingly waived his Miranda rights before voluntarily confessing.
We also reject defendant's contention that his young age and low intelligence precluded him from making a voluntary, knowing, and intelligent waiver. "`Neither a low I.Q. nor any particular age of minority is a proper basis to assume lack of understanding, incompetency, or other inability to voluntarily waive the right to remain silent under some presumption that the Miranda explanation was not understood.'" (In re Brian W. (1981) 125 Cal.App.3d 590, 603, 178 Cal. Rptr. 159 [15-year-old defendant had an IQ of 81 and the mental age of an 11 or 12 year old].) Although defendant was less than 14 years old (and subsequent to the interviews was diagnosed a paranoid schizophrenic), he participated in his conversations with detectives, and indeed was keen enough to change his story when Detective Lean revealed that the fire originated from inside the car. Both Detective Lean and Investigator Martin testified that defendant expressed no confusion either before or during the interview. Also, defendant's claim that the trial court failed to consider his lack of encounters with the police is undermined by the subsequent witness testimony that defendant received various citations and warnings from the police before 1975.
Thus, apart from defendant's trial testimony, the record does not demonstrate that defendant failed to understand or waive his rights. We do not find persuasive defendant's claim that Investigator Martin, who is Black, was used to employ a Black cop/White cop (i.e., "good guy/bad guy") tactic to elicit an incriminating statement from defendant. It is true that Detective Lean stated it would be helpful that as an older Black man, Investigator Martin might better communicate with the young Black defendant. However, nothing suggests that Investigator Martin unduly influenced defendant. Indeed, the trial court noted it "was not impressed by the fact that Mr. Martin at one point questioned the witness." Thus, we find substantial evidence supports the trial court's finding that no "extraordinary procedures" *315 were used in interviewing defendant.

(ii) Defendant's Request to Speak to His Mother
Defendant argues that he requested to speak to his mother during the interview, thus asserting his Fifth Amendment right. (People v. Rivera (1985) 41 Cal.3d 388, 394, 221 Cal.Rptr. 562, 710 P.2d 362; People v. Burton, supra, 6 Cal.3d at pp. 383-384, 99 Cal.Rptr. 1, 491 P.2d 793; but see People v. Hector (2000) 83 Cal.App.4th 228, 99 Cal.Rptr.2d 469.) Defendant testified that he told a detective that he wanted to speak to his mother and that she did not have a phone, to which the detective replied, "`Something to [sic ] it was around dinner time and I would have to wait.'" Although Detective Lean testified that he did not recall defendant asking to call his mother, defendant maintains he made his request to Investigator Martin who performed a portion of the interview.
Defendant has waived this claim by raising it for the first time on appeal. (People v. Raley, supra, 2 Cal.4th at p. 892, 8 Cal.Rptr.2d 678, 830 P.2d 712.) Notions of fairness and practicality require that the prosecution be given an opportunity to argue this issue during trial. Without such objection, the parties could not develop the issue or further examine witnesses. Indeed, apart from defendant's self-serving testimony at trial, there was no evidence that defendant in fact requested to talk to his mother during the interview. Detective Lean testified that he did not recall that he or Detective Christensen told defendant he would have to wait before he called his mother. He also testified it was his custom and habit when juveniles requested to speak to their parents or any blood relative, that "it was like asking for an attorney and we were to stop our interview at that point." However, he did not recall that being done. To the extent defendant's request was made to Investigator Martin, defendant did not question the investigator at trial whether defendant asked him if he could talk to his mother, nor did defendant testify that he made his request to Investigator Martin. Further, defendant inconsistently testified that he both did and did not continue to talk to the detective after he requested to talk to his mother, which tended to undermine his credibility on this issue. Indeed, as the Attorney General observes, the request that defendant allegedly made to Investigator Martin would have occurred after defendant had given several different versions of the events to detectives, i.e., when Detective Lean went to get dinner for the juveniles around 5:00 p.m. Given that defendant talked to detectives for an extended time without requesting to talk to his mother, "[t]here is no indication . . . that appellant's request to see his mother, must `be construed to indicate that the minor suspect desire[d] to invoke his Fifth Amendment privilege.'" (People v. Maestas (1987) 194 Cal.App.3d 1499, 1509, 240 Cal.Rptr. 360, quoting People v. Burton, supra, 6 Cal.3d at p. 384, 99 Cal.Rptr. 1, 491 P.2d 793.)
In short, because defendant failed to raise his claim at trial that defendant's request to speak to his mother constituted an invocation of his Fifth Amendment right, we are left with an incomplete record. Thus, we cannot speculate to facts that would have given rise to defendant's claim.

(iii) Readmonishing Defendant of his Miranda Rights
Detective Lean read defendant his Miranda rights at 12:30 p.m. on May 7, 1975, and Investigator Martinwho was advised the sheriffs office had already read defendant his rightsdid not readmonish defendant approximately five hours later prior to conducting the interview in which defendant confessed. The trial court found that *316 Investigator Martin was not required to readmonish defendant of his rights. Defendant claims a violation of his rights under Miranda, and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution because he was not readvised of his rights prior to Investigator Martin's subsequent interrogation.
If a defendant is subsequently interrogated, "readvisement is unnecessary where the subsequent interrogation is `reasonably contemporaneous' with the prior knowing and intelligent waiver. [Citations.] The courts examine the totality of the circumstances, including the amount of time that has passed since the waiver, any change in the identity of the interrogator or the location of the interview, any official reminder of the prior advisement, the suspect's sophistication or past experience with law enforcement, and any indicia that he subjectively understands and waives his rights. [Citations.]" (People v. Mickle (1991) 54 Cal.3d 140, 170, 284 Cal.Rptr. 511, 814 P.2d 290 [readvisement unnecessary where defendant twice received and twice waived Miranda rights 36 hours before].)
The approximately five hours that had elapsed did not reduce the effectiveness of defendant's initial waiver, particularly where defendant was mentally alert, spoke freely, and "understood what was going on" in the subsequent interrogation. Defendant also remained in the same room for the ongoing interviews with the detectives and investigator. Moreover, there was some evidence that defendant had prior experience with police based on citations and warnings he received from the police before 1975. Contrary to defendant's suggestion, the fact that defendant was a minor did not in and of itself require the police to readvise the defendant of his Miranda rights if the defendant had previously made a knowing and intelligent waiver. (In re Frank C, supra, 138 Cal.App.3d at p. 714, 188 Cal. Rptr. 68 ["on the record before us there is no reason to assume the minor did not understand [his Miranda rights] when first given to him or he had already forgotten the admonitions of an hour before or that he had invoked his rights or he did not understand he had already invoked them or he did not understand he was waiving them"].) Moreover, although Detectives Lean and Christensen and Investigator Martin took turns interviewing defendant, this change in the identities of the interrogators does not alter the reasonably contemporaneous nature of the subsequent interrogation, which was part of an ongoing and cooperative process.
Thus, we conclude that under the totality of the circumstances, the detectives were not required to readvise defendant of his Miranda rights in a subsequent interrogation which we find was "`reasonably contemporaneous'" with defendant's initial knowing and intelligent waiver. (People v. Mickle, supra, 54 Cal.3d at p. 170, 284 Cal.Rptr. 511, 814 P.2d 290.)

2. Claim of Jury Misconduct
Defendant moved to set aside the penalty verdict based on allegations that religious beliefs improperly influenced several jurors. Alternatively, he requested a hearing to investigate possible jury misconduct. (People v. Hedgecock (1990) 51 Cal.3d 395, 272 Cal.Rptr. 803, 795 P.2d 1260.) The trial court denied both motions, along with defendant's subsequent oral motion for reconsideration. Defendant asserts error based on the trial court's denial.
Defendant submitted a declaration from Juror Jeffrey E. stating that all 12 jurors held hands and prayed at the start of deliberations during both the guilt and *317 penalty phases. During penalty deliberations, Jury Foreperson Paul W. questioned the jurors why they could not reach a verdict. According to Jeffrey E., Juror Sally B. `"said she needed some time to make the right decision, knew what was right, but was having difficulty in voting.'" Paul W. responded that "`he did not know if it would help her, but what had helped him make his decision was that [defendant] had been exposed to Jesus Christ and if that was in fact true [defendant] would have `everlasting life' regardless of what happened to him.'" Jeffrey E. concluded, "Sometime after that we reach[ed] a verdict." Defendant did not submit a declaration from either Sally B. or Paul W., but intended to subpoena them to appear and testify at the Hedgecock hearing.
In addition, a few days after the trial, Paul W. sent Defense Counsel Neal Pedowitz a letter requesting to meet and talk with defendant. Less than two months later, he sent a second letter and the book Born Again. Paul W. wrote that Pedowitz will have "real inner peace" and "purpose" by having a personal relationship with God and by accepting Jesus Christ, and urged that both Pedowitz and defendant read Born Again, which is "not about religion but relationship."
The trial court denied defendant's motion. Relying on Hedgecock, the trial court found that Jeffrey E.'s declaration describing the conversation between Sally B. and Paul W. was inadmissible under Evidence Code section 1150, subdivision (a). This provision "may be violated not only by the admission of jurors' testimony describing their own mental processes, but also by permitting testimony concerning statements made by jurors in the course of their deliberations." (People v. Hedgecock, supra, 51 Cal.3d at pp. 418-419, 272 Cal.Rptr. 803, 795 P.2d 1260.) The court also determined that Paul W.'s letters and book sent to defense counsel after the trial was over were irrelevant.
Defendant argues that Paul W.'s statement did not relate to his mental processes during deliberations, evidence of which is proscribed by Evidence Code section 1150, subdivision (a). Rather, his statement constituted evidence that Paul W. prejudicially influenced Sally W. with "an entirely illegitimate basis for imposing a death sentence." Defendant maintains that the jurors were improperly exposed to an extraneous source outside the record, i.e., an "extra-judicial code of conduct." (Jones v. Kemp (N.D.Ga.1989) 706 F.Supp. 1534, 1559; see also People v. Sandoval (1992) 4 Cal.4th 155, 193-194, 14 Cal.Rptr.2d 342, 841 P.2d 862.) Also, Paul W.'s statement that if defendant had been exposed to Jesus Christ he would have everlasting life whatever happened to him, "sharp[ly] contrasted" with the jury instruction that life means life and death means death.[9] Thus, the trial court should have set aside the penalty verdict, or at a minimum, held a healing to investigate the allegations of jury misconduct. For reasons that follow, we reject all points, which we discuss in turn.
In Hedgecock, we held that a trial court may conduct a hearing to determine the truth of jury misconduct allegations, when the court "in its discretion, concludes that an evidentiary hearing is necessary to resolve material, disputed issues of fact." (People v. Hedgecock, supra, 51 Cal.3d at p. 415, 272 Cal.Rptr. 803, 795 P.2d 1260.) We emphasized, however, the limitations *318 of Evidence Code section 1150, subdivision (a). {People v. Hedgecock, supra, 51 Cal.3d at pp. 418-419, 272 Cal.Rptr. 803, 795 P.2d 1260.) Although Evidence Code section 1150, subdivision (a) permits a court to receive otherwise admissible evidence about matters that may have influenced a verdict improperly, it limits the evidence as follows: "No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." Thus, "when a juror in the course of deliberations gives the reasons for his or her vote, the words are simply a verbal reflection of the juror's mental processes. Consideration of such a statement as evidence of those processes is barred by Evidence Code section 1150." (People v. Hedgecock, supra, 51 Cal.3d at p. 419, 272 Cal.Rptr. 803, 795 P.2d 1260.)
The trial court correctly determined that defendant's proffered evidence was inadmissible under Evidence Code section 1150, subdivision (a). The exchange between Sally B. and Paul W. clearly involved their decisionmaking processes. (People v. Hedgecock, supra, 51 Cal.3d at p. 419, 272 Cal.Rptr. 803, 795 P.2d 1260.) Sally B.'s statement evinced her struggle and difficulty when deciding whether to sentence defendant to death. Likewise, Paul W.'s statement described how he came to reconcile his decision to vote for the death penalty.
As an exception, Evidence Code section 1150, subdivision (a) does not prohibit admitting a statement that reflects a juror's reasoning processes if the statement itself amounts to juror misconduct, comparable to an objective fact such as reading a novel during trial, or consulting an outside attorney for advice on law relevant to the case. (In re Stankewitz (1985) 40 Cal.3d 391, 398, 220 Cal.Rptr. 382, 708 P.2d 1260.) However, we disagree that Paul W.'s statement itself constituted misconduct.
Contrary to defendant's contention, by referring to Jesus Christ and defendant's possible everlasting life, Paul W. did not improperly refer to an extraneous sourcehis personal religious beliefs or a code that mandated a particular course of conductto influence Sally B.'s vote. (Cf. People v. Mincey, supra, 2 Cal.4th at pp. 465-467, 6 Cal.Rptr.2d 822, 827 P.2d 388 [jurors improperly read Bible passages during deliberations].) "`The introduction of much of what might strictly be labeled "extraneous law" cannot be deemed misconduct. The jury system is an institution that is legally fundamental but also fundamentally human. Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience. That they do so is one of the strengths of the jury system. It is also one of its weaknesses: it has the potential to undermine determinations that should be made exclusively on the evidence introduced by the parties and the instructions given by the court. Such a weakness, however, must be tolerated.'" (People v. Riel (2000) 22 Cal.4th 1153, 1219, 96 Cal. Rptr.2d 1, 998 P.2d 969.)
That jurors may consider their religious beliefs during penalty deliberations is also to be expected. "The court in no way means to suggest that jurors cannot rely on their personal faith and deeply-held beliefs when facing the awesome decision of whether to impose the sentence of death on a fellow citizen." (Jones v. Kemp, supra, 706 F.Supp. at p. 1560; cf. People v. Freeman (1994) 8 Cal.4th 450, 515, 34 Cal.Rptr.2d 558, 882 P.2d 249.) Given the collective nature of jury deliberations, we do not find it unusual, much less *319 improper, that jurors here may have shared their beliefs with other jurors either through conversations or prayers.
We find nothing in the record, moreover, that suggests the jurors disregarded the law or the court's instructions, and instead imposed a higher or different law. (People v. Sandoval, supra, 4 Cal.4th at p. 193, 14 Cal.Rptr.2d 342, 841 P.2d 862.) The fact that some jurors expressed their religious beliefs or held hands and prayed during deliberations may have reflected their need to reconcile the difficult decisionpossibly sentencing a person to deathwith their religious beliefs and personal views. (See Jones v. Kemp, supra, 706 F.Supp. at p. 1560.) But it does not show that jurors supplanted the law or instructions with their own religious views and beliefs. (See People v. Sandoval, supra, 4 Cal.4th at p. 194, 14 Cal.Rptr.2d 342, 841 P.2d 862 ["We do not mean to rule out all reference to religion or religious figures so long as the reference does not purport to be a religious law or commandment."].) "We will not presume greater misconduct than the evidence shows." (In re Carpenter (1995) 9 Cal.4th 634, 657, 38 Cal.Rptr.2d 665, 889 P.2d 985.)
Contrary to defendant's contention, we disagree that Paul W.'s statement that defendant may have "everlasting life" contradicts the jury instruction that states, in defendant's words, life means life and death means death. Everlasting life obviously does not exist in the physical world. In that regard, Paul W. did not dispute that death does not mean death, but instead was referring to spiritual everlasting life, a commonly understood expression of religious belief and faith. We assume that Sally B. perceived the difference between physical and spiritual everlasting life in light of the jury instruction. "Jurors are presumed to be intelligent, capable of understanding instructions and applying them to the facts of the case." (Conservatorship of Early (1983) 35 Cal.3d 244, 253, 197 Cal.Rptr. 539, 673 P.2d 209.)
The cases upon which defendant relies are inapposite. Unlike in People v. Sandoval, supra, 4 Cal.4th at pages 193-194, 14 Cal.Rptr.2d 342, 841 P.2d 862, the prosecutor here did not make the religious references to Jesus Christ and everlasting life. "Reference by either party to religious doctrine, commandments or biblical passages tending to undermine that principle [that the jury should base their penalty determinations on evidence and legal instructions before it] is improper." (People v. Sandoval, supra, 4 Cal.4th at p. 194, 14 Cal.Rptr.2d 342, 841 P.2d 862.) A juror, Paul W., made the references in the course of deliberations. Unlike in People v. Mincey, supra, 2 Cal.4th at pages 465-467, 6 Cal.Rptr.2d 822, 827 P.2d 388, and Jones v. Kemp, supra, 706 F.Supp. at page 1559, the jurors did not consult material extraneous to the record, like the Bible. Rather, Paul W. merely shared with Sally B. his personal religious view and how he reconciled his vote for the death penalty. Finally, unlike in In re Stankewitz, supra, 40 Cal.3d at pages 399-400, 220 Cal.Rptr. 382, 708 P.2d 1260, Paul W. did not disregard a court's instruction, consult his own outside experience, and share his erroneous legal advice with other jurors. Again, he merely shared his personal view and did not purport to validate it as truth or impose his view on others. These distinctions underscore the privacy and sanctity of jury deliberations, i.e., "`the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved.'" (In re Stankewitz, supra, 40 Cal.3d at p. 400, 220 Cal.Rptr. 382, 708 P.2d 1260; In re Hamilton (1999) 20 Cal.4th 273, 294, fn. 17, 84 Cal.Rptr.2d 403, 975 P.2d 600.)
*320 Accordingly, we reject defendant's federal constitutional challenge based on his Sixth and Fourteenth Amendment rights to due process and trial by jury. We also reject defendant's argument that the jurors had a diminished sense of responsibility when they sentenced defendant to death, in violation of Caldwell v. Mississippi (1985) 472 U.S. 320, 328-330, 105 S.Ct. 2633, 86 L.Ed.2d 231, and defendant's Eighth and Fourteenth Amendment rights to a reliable, individualized capital sentencing determination. (See People v. Wash (1993) 6 Cal.4th 215, 258-261, 24 Cal.Rptr.2d 421, 861 P.2d 1107.)

3. Section 190.3, Factor (b)Arson
Under section 190.3, factor (b), the prosecution introduced evidence of defendant's criminal activity involving express or implied use of force or violence or the threat of force or violence, which included a February 20, 1989 arson where defendant started a fire in a trash can outside his cell in the Fresno County jail. Defendant maintains this arson incident did not involve violence or a threat of violence and was thus inadmissible. (See People v. Boyd (1985) 38 Cal.3d 762, 776-777, 215 Cal.Rptr. 1, 700 P.2d 782.)
Sergeant Heggen testified that while he was on duty at the Fresno County jail, he received word over the intercom that an inmate, not defendant, did not receive his breakfast tray. Sergeant Heggen also received a message from cell 3 B 10, which defendant occupied alone, that there would be a disturbance involving a fire if the inmate did not receive his tray. While the officers prepared to distribute the breakfast tray, several fires were started in a common room shared by all inmates in the housing unit. Correctional Officer Ronald Moreno testified that when he went to investigate the matter, he saw an arm reach out of cell 3-B 10, and throw a burning sheet into a trash can nearby. The trial court instructed the jury that it may consider "[a]rson (burning the property of Fresno County)" as an aggravating circumstance if the jury was satisfied beyond a reasonable doubt that defendant had committed the crime. However, defendant emphasizes that Sergeant Heggen testified that he had not believed initially that he had a disturbance at hand requiring assistance from other officers, and that he had not seen an inmate start the fire.
Because defendant failed to object to the admission of the arson incident at trial, he may not raise the issue on appeal. (People v. Stanley (1995) 10 Cal.4th 764, 824, 42 Cal.Rptr.2d 543, 897 P.2d 481.) In any event, his claim fails on the merits. Defendant's express threat to cause a disturbance with a fire and his follow-up act of throwing a burning sheet into a trash can outside his cell, involved a threat to use force or violence against a person under section 190.3, factor (b). We disagree that defendant intended only to cause property damage. Over a dozen inmates resided in the housing unit where the fires occurred. It is a reasonable inference that the inmates would have been exposed to flames and smoke inhalation if the correctional officers could not put out the fire in time. It is equally inferable that the officers who had to extinguish the fire would have exposed themselves to the physical danger of not only the fire but also the inmates. (See People v. Stanley, supra, 10 Cal.4th at p. 824, 42 Cal.Rptr.2d 543, 897 P.2d 481 [car arson involved implied threat of violence under § 190.3].)
Contrary to defendant's suggestion, Sergeant Heggen's subjective belief that he did not have a disturbance at hand does not establish the absence of violence or the threat of violence by defendant. Moreover, although Sergeant Heggen himself did not see any inmate start the fire, *321 Correctional Officer Moreno saw an arm from defendant's cell reach out and throw a burning bed sheet. It is a reasonable assumption that defendant, as the only inmate occupying that cell, started that fire.

4. Claim of Disproportionate Punishment
Should we accept defendant's arguments that evidence of Rogers's murder and the arson incident were inadmissible, defendant asserts that his culpability is no longer proportional to his death sentence. Defendant also points out the trial court expressly gave little or no weight to the April 1986 purse snatchings, and the Norman L., Steven 0., and inmate assaults, as factors in aggravation. Because the trial court declined to consider some incidents in aggravation, and, as defendant argues, should not have considered other incidents in aggravation, defendant's sentence is now disproportionate to his culpability under the cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution, and the cruel or unusual punishment clause of the California Constitution, article I, section 17.
We disagree. As discussed previously, the evidence regarding defendant's involvement both in Rogers's murder and in the arson incident was admissible. Thus, defendant's claim of disproportionate punishment necessarily fails.

5. Jury Instruction to Exercise Mercy
Defendant requested the trial court to instruct the jury that "[i]n determining whether to sentence the defendant to life imprisonment without possibility of parole, or to death, you may decide to exercise mercy on behalf of the defendant." He argues that the trial court's refusal to give the instruction deprived him of his Eighth Amendment right to an individualized capital sentencing determination. Not so. We have cautioned that "`the jury must "ignore emotional responses that are not rooted in the aggravating and mitigating evidence introduced during the penalty phase." [Citation.] The jury may not act on whim or unbridled discretion.'" (People v. Clark (1992) 3 Cal.4th 41, 164, 10 Cal.Rptr.2d 554, 833 P.2d 561.) "The unadorned use of the word `mercy' implies an arbitrary or capricious exercise of power rather than reasoned discretion based on particular facts and circumstances. Defendant was not entitled to a pure `mercy' instruction." (People v. McPeters, supra, 2 Cal.4th 1148, 1195, 9 Cal.Rptr.2d 834, 832 P.2d 146.) Accordingly, the trial court did not err by refusing the instruction.
Moreover, the instruction was cumulative. The trial court instructed the jury with CALJIC No. 8.85, which allows the jury to consider "any sympathetic . . . aspect of the defendant's character, or record" in connection with the relevant statutory factors. (People v. Nicolaus (1991) 54 Cal.3d 551, 588-589, 286 Cal.Rptr. 628, 817 P.2d 893.) In closing argument, both defense counsel urged the jury to show sympathy and mercy to defendant. Thus, the trial court adequately instructed the jury.

6. Constitutional Challenges to the California Death Penalty Statute
Defendant raises numerous challenges to the California death penalty statute (§ 190 et seq.), which we have long rejected.
Contrary to defendant's contention, section 190.2 is not impermissibly broad. (People v. Jenkins, supra, 22 Cal.4th at p. 1050, 95 Cal.Rptr.2d 377, 997 P.2d 1044; People v. Bradford (1997) 14 Cal.4th 1005, 1058, 60 Cal.Rptr.2d 225, 929 *322 P.2d 544; People v. Ray (1996) 13 Cal.4th 313, 356-357, 52 Cal.Rptr.2d 296, 914 P.2d 846.) We have noted that the categories of special circumstances have not been construed in an unduly expansive manner. (People v. Arias (1996) 13 Cal.4th 92, 187, 51 Cal.Rptr.2d 770, 913 P.2d 980.) Contrary to defendant's suggestion, we see no basis to revisit the issue. We conclude that "[h]aving been found guilty of intentional murder in the course of robbery, defendant falls within the `subclass' of murderers who are eligible for the death penalty." (Ibid.)
Defendant also argues that section 190.3, factor (a)which allows the jury to consider the "circumstances of the crime" as an aggravating factoris impermissibly vague. Pointing to cases in which the aggravating circumstances were arguably inconsistent (e.g., the defendant killed with a motive to rob or the defendant killed for no reason at all; the victim had children or the victim had no chance to have children), he asserts that section 190.3, factor (a) "has been used in ways so arbitrary and contradictory as to violate the federal guarantee of due process of law."
Both the United States Supreme Court and this court have rejected this claim. (Tuilaepa v. California (1994) 512 U.S. 967, 976, 114 S.Ct. 2630, 129 L.Ed.2d 750; People v. Jenkins, supra, 22 Cal.4th at pp. 1050-1053, 95 Cal.Rptr.2d 377, 997 P.2d 1044.) Finding that section 190.3, factor (a) provides adequate guidance to a jury in sentencing, we have concluded that the jury in determining penalty "should" consider circumstances of the crime, but that this is "an individualized, not a comparative function." (People v. Jenkins, supra, 22 Cal.4th at p. 1052, 95 Cal.Rptr.2d 377, 997 P.2d 1044.) As such, "[t]he ability of prosecutors in a broad range of cases to rely upon apparently contrary circumstances of crimes in various cases does not establish that a jury in a particular case acted arbitrarily and capriciously." (Id. at p. 1053, 95 Cal.Rptr.2d 377, 997 P.2d 1044, italics omitted.) Accordingly, defendant's claim must similarly fail.
Contrary to defendant's contentions, juries are not required to (1) make written findings regarding aggravating circumstances, (2) achieve unanimity as to aggravating circumstances, (3) find beyond a reasonable doubt that either aggravating circumstances are proved (other than other criminal conduct) and the aggravating circumstances outweigh those in mitigation, or that death is the appropriate penalty. (People v. Jenkins, supra, 22 Cal.4th at p. 1053, 95 Cal.Rptr.2d 377, 997 P.2d 1044, citing People v. Arias, supra, 13 Cal.4th at p. 190, 51 Cal.Rptr.2d 770, 913 P.2d 980; People v. Marshall (1990) 50 Cal.3d 907, 935-936, 269 Cal.Rptr. 269, 790 P.2d 676; People v. Rodriguez (1986) 42 Cal.3d 730, 777, 230 Cal.Rptr. 667, 726 P.2d 113.) Also, a trial court need not instruct as to any burden of proof when determining the sentence to be imposed. (People v. Jenkins, supra, 22 Cal.4th at pp. 1053-1054, 95 Cal.Rptr.2d 377, 997 P.2d 1044.)
We also reject defendant's claim that because it does not require intercase proportional review, the California death penalty statute ensures arbitrary, discriminatory, or disproportionate impositions of death sentences. "[U]nless a defendant demonstrates that the state's capital punishment law operates in an arbitrary and capricious manner, the circumstance that he or she has been sentenced to death, while others who may be similarly situated have received a lesser sentence, does not establish disproportionality violative of the Eighth Amendment." (People v. Crittenden (1994) 9 Cal.4th 83, 157, 36 Cal.Rptr.2d 474, 885 P.2d 887.) Moreover, *323 we disagree that defendant is denied equal protection and substantive due process because noncapital defendants receive some comparative review under the determinate sentencing law. [People v. Jenkins, supra, 22 Cal.4th at p. 1053, 95 Cal.Rptr.2d 377, 997 P.2d 1044.)
Defendant also asserts that the jury improperly considered defendant's unadjudicated criminal activity (purse snatchings, assaults, arson) introduced by the prosecution. He maintains the jury's use of this evidence during the penalty phase violates his right to due process, and the Fifth, Sixth, Eighth, and Fourteenth Amendments, thus rendering his death sentence unreliable. He is wrong. (People v. Jenkins, supra, 22 Cal.4th at p. 1054, 95 Cal.Rptr.2d 377, 997 P.2d 1044.)
Contrary to defendant's assertions, the "`[u]se of the words "extreme" and "substantial" in section 190.3, factors (d) and (g), does not impermissibly limit consideration of mitigating factors in violation of the federal Constitution.'" {People v. Jenkins, supra, 22 Cal.4th at pp. 1054-1055, 95 Cal.Rptr.2d 377, 997 P.2d 1044.) The trial court is not required to identify which sentencing factors are aggravating and which are mitigating. {People v. Davenport (1995) 11 Cal.4th 1171, 1229, 47 Cal.Rptr.2d 800, 906 P.2d 1068.) Moreover, the trial court here instructed that the "absence of a mitigating factor should not count as a factor in aggravation."

III. DISPOSITION
We affirm the judgment in its entirety.
GEORGE, C.J., BAXTER, J., WERDEGAR, J., and BROWN, J., concur.
Concurring Opinion by KENNARD, J.
I generally concur in the majority opinion. I disagree, however, with its analysis of the issue described below.
At the penalty phase of defendant's capital trial, the prosecution introduced evidence that one morning at the Fresno County jail, defendant called a guard to complain that another inmate had not received his breakfast tray. He said that if the inmate did not receive the tray, "there was going to be some disturbance" that would involve a fire. Thereafter, defendant set fire to his bed sheet, which he then threw into a trash can outside his cell. Other prisoners who had made similar calls burned bedding and pieces of paper. At trial, defendant did not object to this evidence, but he now argues it was inadmissible because it did not fall within the aggravating factors set forth in Penal Code section 190.3.
The majority correctly holds that because at trial defendant did not object to the evidence in question, he may not now challenge its admissibility. The majority goes on to state, however, that even if defendant had objected, the evidence would have been admissible as evidence of "criminal activity by the defendant which involved the express or implied threat to use force or violence." (Pen. Code, § 190.3, factor (b) (hereafter factor (b).)) I disagree.
There was no evidence that defendant, when he threatened to create a disturbance and thereafter set fire to the trash can outside his cell, was threatening to injure anyone. I recognize that under certain circumstances an act of arson would be admissible under factor (b) as a threat to use violence. An example would be the scenario in People v. Stanley (1995) 10 Cal.4th 764, 824, 42 Cal.Rptr.2d 543, 897 P.2d 481, a case on which the majority relies. There, in a series of acts designed to terrorize the victim, the defendant set fire to the victim's car, raped her, and eventually killed her. In contrast, here *324 defendant intended only to inflict property damage. He threw the burning bed sheet not at a guard or a fellow inmate but into a trash can. As this court has explained: "We do not believe that violent injury or the threat of violent injury to property is sufficient to justify admissibility [under factor (b)]." (People v. Boyd (1985) 38 Cal.3d 762, 776, 215 Cal.Rptr. 1, 700 P.2d 782, italics added; see also People v. Kirkpatrick (1994) 7 Cal.4th 988, 1013, 30 Cal. Rptr.2d 818, 874 P.2d 248 ["To be admissible under [factor (b) ], a threat to do violent injury must . . . be directed against a person or persons, not against property."].) Accordingly, here defendant's conduct is not an aggravating circumstance under factor (b).
Insisting that defendant's conduct involved a "threat to use force or violence against a person" (maj. opn., ante, 110 Cal.Rptr.2d at p. 320, 28 P.3d at p. 74), the majority asserts that the "officers who had to extinguish the fire would have exposed themselves to the physical danger of not only the fire but also the inmates" (id., 110 Cal.Rptr.2d at pp. 320-321, 28 P.3d at pp. 74-75). The record contains no evidence, however, that the guards who extinguished the fires were exposed to any risk of injury.
The majority also asserts that the inmates who lived in the housing unit where the fires occurred "would have been exposed to flames and smoke inhalation if the correctional officers could not put out the fire in time." (Maj. opn., ante, 110 Cal.Rptr.2d at pp. 320-321, 28 P.3d at pp. 74-75.) But none of the guards who testified for the prosecution said there was any danger that the trash can fire set by defendant could spread and endanger the safety of other inmates. Jail floors are generally made of metal or cement, and there is no evidence that the floor of the Fresno County jail was made of a flammable material. Thus, even if not extinguished, the trash can fire would simply have burned itself out without risk of harm to others.
NOTES
[1] All further statutory references are to the Penal Code unless otherwise designated.
[2] Ruling on defendant's automatic application for modification of the death verdict, the trial court gave little weight to the Norman Logan, Steven Ohler, and inmate assaults, and the purse snatchings.
[3] See People v. Alcala (1984) 36 Cal.3d 604, 620, footnote 6, 205 Cal.Rptr. 775, 685 P.2d 1126 ("Confabulation is a process by which the witness fills gaps in memory with false and imaginary information, often implanted by others, and comes to believe in the truth of his reconstruction.")
[4] One commentator has noted the confusion between a witness's competency under Evidence Code section 701, which relates to a witness's capacity to communicate and to understand the duty to tell the truth, and a witness's lack of personal knowledge under Evidence Code section 702, which relates to the witness's capacity to perceive and recollect. (1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 3d ed. 2001) Competency and Qualification of Witnesses, § 26.7, pp. 414-415.) Although many, including defendant, have referred to a witness's capacity to perceive and to recollect (Evid.Code, § 702) as an issue of competency to testify, the term "competency" is more precisely referring to a witness's qualification to testify under Evidence Code section 701, subdivision (b). (See People v. Dennis, supra, 17 Cal.4th at p. 525, 71 Cal.Rptr.2d 680, 950 P.2d 1035.)
[5] Section 1111 provides, in pertinent part, that "[a] conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense
[6] Section 31 defines principals as "[a]ll persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . ."
[7] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."
[8] "The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (§ 190.3, factor (b).)
[9] The jury was instructed as follows: "The term `life without possibility of parole' means that the defendant will remain in prison the rest of his natural life, never to be paroled. The term `death penalty' means that the defendant will be executed by the State of California."