Filed 1/23/14  P. v. Garay CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOE LUIS GARAY, JR.,<br><br>    Defendant and Appellant. | G047554<br><br>(Super. Ct. No. 09ZF0066)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Thomas M. Goethals, Judge.  Affirmed as modified.

Randall Bookout, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Kristine A. Gutierrez and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

Joe Garay, Jr., appeals from a judgment sentencing him to 15 years to life in prison for second degree murder. He contends his conviction must be reversed due to instructional error, but we disagree. Other than to modify the amount of appellant's presentence credits, we affirm the judgment against him.

FACTS

The events giving rise to this case occurred in the spring of 1996. At that time, appellant and Kevin Carlson were in an Anaheim gang called the Devious Hoodlums (DH). Appellant's best friend was Ruben Calderon. Calderon was not in DH, but his girlfriend Christi Parenti was. Parenti was also pregnant with Calderon's child.[1]

*The Prosecution's Case*

On the afternoon of March 5, 1996, appellant and Calderon were at the house of Calderon's godmother, Kim Bouzikian. After speaking with Carlson on the phone, appellant told Calderon that Carlson was on his way over. Appellant also said he and Carlson were going to go to Fullerton to see if they could "catch somebody slipping." Explaining what that meant to him, Calderon testified Carlson had been disrespected a couple of weeks earlier by a member of a gang called the Fullerton Suicidal Gang (FSG). Calderon surmised Carlson and appellant were going to Fullerton to see if they could find a FSG member who was all alone so they could exact revenge for that disrespect.

A short while later, Carlson picked up appellant at Bouzikian's home. They were gone for about 45 minutes before returning to the house and speaking with Calderon. According to Calderon, appellant "looked like a ghost," and Carlson, aka Boxer, was "pumped up" and had blood on his shoes. When Calderon asked them what happened, Carlson said, "I beat the shit out of him and Joe (appellant) stuck him." Appellant did not say anything in response to that statement.

---

[1]  Parenti and Calderon were married by the time of trial in 2012.

2

It turned out Carlson and appellant had attacked FSG member Troy Gorena near a crosswalk in Fullerton. When the police arrived at the scene, they discovered Gorena had been stabbed twice in the back. He also had a bruise on his forehead and a cut above his right eyebrow. Gravely injured, the only information Gorena was able to provide was that he had been attacked by two six-foot, white males in their 20's with shaved heads. Paramedics tried to aid Gorena, but he died on the way to the hospital.

Within days of the attack, Calderon learned from news reports that Gorena was only 16 years old. Having children of his own, Calderon was upset Carlson and appellant had killed a person who was so young. When Calderon confronted appellant about the stabbing, appellant admitted, "Yeah, I stuck him."

Parenti, Calderon's girlfriend, was also upset about Gorena's murder. Although she was in the DH gang, she knew lots of FSG members from having grown up in Fullerton. In expressing her displeasure to appellant, she accused him of being a "motherfucking murderer." Appellant admitted to Parenti he had stabbed Gorena, and Carlson had "beat the shit out of him."

Parenti also spoke with Carlson about the stabbing. Referring to a pocketknife Parenti had given him as a gift, Carlson told her the knife was "put to good use," but not by him. He said he gave the knife to appellant before they confronted Gorena, so appellant would "have his back." Then, after he beat up Gorena, appellant stabbed him with the knife.

After speaking with Carlson and appellant, Parenti told Calderon what they had told her. Calderon told Parenti to "keep [her] mouth shut," but she told Calderon's mother Gloria Cueva what she knew. Parenti also made it clear to Cueva that she was afraid to go to the police. So Cueva went behind Parenti's back and arranged for the police to show up unbeknownst at a café where she and Parenti were having lunch one day. At the café, Parenti reluctantly told investigators what she knew. She also said she

3

did not want to be a witness in the case and begged the officers to keep her name out of the investigation.

Based on Parenti's information, appellant and Carlson were arrested for murder. However, when word got out Parenti had talked to the police, she and Calderon began receiving threats, and Calderon told her he was going to leave her if she didn't "fix" things. Fearing for her well-being, Parenti eventually buckled under the stress of the situation and recanted her story. Since she was the key witness in the case, the charges against appellant and Carlson were dropped.

However, in 2008 the case gained new life when a jailhouse informant came forward with new information. Jacob Mata told authorities that when he was housed in county jail with appellant in 1996, appellant told him he was locked up for stabbing a guy in Fullerton. At trial, Mata testified that, in confiding in him about the stabbing, appellant said "we did it." However, Detective David Rondou testified that when he interviewed Mata in jail, Mata said appellant had told him that he had personally committed the stabbing. Rondou also testified that when a gang member is disrespected, they are expected to retaliate with violence in order to save face.

Another break in the case came when Calderon came forward to the police and told them what he knew about the stabbing. Although Calderon had previously pressured Parenti to "keep [her] mouth shut," he eventually cooperated with authorities because he felt bad for Gorena's family and the case was "eating him up." At trial, he testified Carlson was the one who beat up Gorena, and appellant was the one who stabbed him. However, during his grand jury testimony, Calderon testified appellant was the beater, and Carlson was the stabber.

*The Defense*

Carlson was the main witness for the defense. Like appellant, he was charged with murdering Gorena, but pursuant to a plea bargain, he pleaded guilty to aggravated assault and was given credit for time served in exchange for testifying

4

truthfully at appellant's trial.  As part of his plea bargain, he was also granted use immunity for his testimony.

Carlson testified that in the weeks leading up to Gorena's murder, he had a run-in with an FSG member known as "Boo-boo."  During that incident, Boo-boo's companion pushed Carlson into a planter, and Carlson felt like he "got punked."  He didn't do anything about it at the time, but on the morning of the murder, he saw Boo-boo while he was driving in Fullerton, and his mind turned toward revenge.

Later that day, Carlson was driving with his cousin Michael Heatley and Heatley's friend Jon Mainberger.  They saw appellant walking alone and decided to pick him up, too.  Then they drove to Fullerton to look for Boo-boo.  Although they didn't find him, they did spot Gorena walking by himself, which prompted Carlson to pull over.  At trial, Carlson testified he didn't know Gorena.  He said he intended to "hit him up"— find out what gang he was in — and if it turned out Gorena was in FSG, he was going to beat him up.  According to Carlson, he was seeking revenge on his own behalf; the incident did not have anything to do with appellant.  However, before leaving his car, he gave appellant a knife and told appellant to back him up.  Carlson also had a knife.  As he and appellant set out to confront Gorena, Heatley and Mainberger stayed behind in Carlson's car.

The fight was a mismatch.  When Gorena told Carlson he belonged to FSG, Carlson swiftly took him down with a flurry of punches without any help from appellant.  While Gorena was lying on the sidewalk, Carlson told him to "tell his homeboys a white boy kicked his ass."  Carlson and appellant then ran back to Carlson's car.  At that point, appellant told Carlson he had stabbed Gorena.  Carlson was surprised.  In fact, he did not see appellant anywhere near Gorena during the encounter.  While they were driving away, appellant wanted to throw his bloody knife out the window, but Carlson took the weapon and disposed of it a few days later.  At that time, appellant told Carlson the knife went into Gorena "like butter."

5

*The Verdict*

In closing argument, the prosecution told the jurors they could find appellant guilty of first degree murder under any one of three theories:  1) as an actual perpetrator; 2) as an aider and abettor; or 3) as part of an uncharged conspiracy.  The defense argued appellant was an innocent bystander who was not guilty of any crime.  In the end, the jury convicted appellant of second degree murder.  He was sentenced to 15 years to life in prison for the crime.

I

Appellant contends the trial court erred in failing to give a unanimity instruction with regard to the prosecution's theories of culpability.  We disagree.

"In a criminal case, a jury verdict must be unanimous.  . . .  Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime.  [Citation.]  Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act.  [Citations.]"  (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.)  On the other hand, when "the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty."  (*Ibid*.)

Appellant concedes the jury was not required to unanimously agree on whether he was liable for murder as the direct perpetrator or an aider and abettor. However, he maintains a unanimity instruction was required in light of the uncharged conspiracy theory because that theory essentially posited a separate offense that was not necessarily based on the same operative facts as the murder.  For instance, under that theory, the jury could have convicted appellant of murder if it found:  1) Appellant and Carlson agreed to commit aggravated assault; 2) they committed an overt act in

6

furtherance of the conspiracy, such as driving into FSG territory; and 3) murder was a natural and probable consequence of their agreement.

Appellant fails to cite any authority that requires a unanimity instruction to be given under the circumstances presented in this case. And, in fact, the California Supreme Court has ruled that when, as here, conspiracy is not charged as a separate crime, but is merely offered "as an alternative theory of liability for the charged, substantive crime of murder" the jury is not required to agree on the theory of guilt. (*People v. Valdez* (2012) 55 Cal.4th 82, 154.) Even though the prosecution relied on the natural and probable consequences doctrine in this case, there was still only one distinct crime, and that is the key to deciding whether a unanimity instruction must be given. (*People v. Russo, supra,* 25 Cal.4th at pp. 1134-1135.)

While "it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed [him] guilty of another[,] . . . unanimity as to exactly how the crime was committed is not required. Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.]" (*People v. Russo, supra,* 25 Cal.4th at pp. 1134-1135.)

Here, there was but one discrete criminal event: Gorena's murder. Therefore, despite the fact the prosecution presented multiple theories and acts under which appellant was potentially liable for that crime, the jury was not required to unanimously agree on which theory or acts supported its verdict. No instructional error has been shown.

## II

Appellant also contends the court's instructions on aiding and abetting were flawed. Although the instructions included some unwarranted verbiage, we do not believe they violated appellant's rights in any fashion.

7

In reviewing appellant's claim, we must keep in mind that jury instructions "'should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111-1112.) We ""'assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. [Citation.]'" [Citation.]" (*Id.* at p. 1111.) In determining whether instructional error has occurred, we must consider the record as a whole, including the specific language challenged, other instructions given, and the arguments of counsel. (*People v. Cain* (1995) 10 Cal.4th 1, 36-37; *People v. McPeters* (1992) 2 Cal.4th 1148, 1191.) Unless there is a reasonable likelihood the jury misunderstood the challenged instruction in a manner that violated defendant's rights, we must uphold the court's charge to the jury. (*Ibid.*)

The trial court instructed the jurors they could find appellant guilty of murder if he directly committed that offense, or aided and abetted Carlson in doing so. The court also instructed on the natural and probable consequences doctrine with respect to the theories of aiding and abetting and conspiracy. Under those instructions, the jurors were told they could convict appellant of murder if he aided and abetted an assault with force likely to produce great bodily injury, or if he agreed with Carlson to commit that offense and murder was a natural and probable consequence of that crime or their agreement to commit it.

The court's instructions also included this sentence: "Before you may decide whether the defendant is guilty of murder you *must* decide whether he is guilty of assault with force likely to produce great bodily injury." (Italics added.) Read in isolation, that instruction was incorrect because appellant's commission of assault with force likely to produce great bodily injury was not a necessary condition for a murder conviction under the uncharged conspiracy theory.

8

However, viewed in context, it is evident the court was not setting forth a necessary condition for convicting appellant of murder. Instead, the court was simply explaining the requirements for a particular theory of murder. The subject language was included in the instructions on aiding and abetting. Specifically, the language was included to explain the prosecution's natural and probable consequences theory. Because assault with force likely to produce great bodily injury was alleged as the target offense under that theory, the jury would have had to find appellant committed that offense in order to convict him of murder under that theory. Therefore, the challenged language made sense in the context in which it was given.

Viewing the instructions as a whole, it is not reasonably likely the jury construed the language in a manner that violated appellant's rights. If anything, the subject language could only have benefitted appellant by requiring the jury to find he committed the target offense when, in fact, his commission of that offense was not a prerequisite for a murder conviction. All things considered, the prosecution had greater cause to complain about the subject language than appellant.

Taking his instructional claim one step further, appellant argues his conviction must be reversed because there is insufficient evidence he committed assault with force likely to produce great bodily injury so as to support the prosecution's natural and probable consequences theory. Assuming the jury based its verdict solely on that theory, the evidence nevertheless shows appellant committed that offense. Indeed, at one point or another, Calderon, Parenti, Mata and Carlson all implicated appellant as the person who stabbed Gorena. Accordingly, any error in the court's aiding and abetting instructions was harmless.

III

Next, appellant claims the trial court prejudicially erred in failing to instruct the jury to consider Carlson's testimony with caution because he was an accomplice to the murder. The claim is not well taken.

9

"'An accomplice is . . . one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.' [Citation.] If sufficient evidence is presented at trial to justify the conclusion that a witness is an accomplice, the trial court must so instruct the jury, even in the absence of a request. [Citation.] Of course, an accomplice has a natural incentive to minimize his own guilt before the jury and to enlarge that of his cohorts; accordingly, the law requires an accomplice's testimony be viewed with caution to the extent it incriminates others. [Citations.] Moreover, an accomplice's testimony must be corroborated before a jury may consider it. [Citation.]" (*People v. Brown* (2003) 31 Cal.4th 518, 555.)

The trial court's duty to instruct on these principles arises only when there is substantial evidence to support the conclusion that one of the government's witnesses is an accomplice. (*People v. Lewis* (2001) 26 Cal.4th 334, 369.) It is not enough that the witness knew about the subject crime, was present during its commission and failed to prevent it from occurring. (*People v. Stankewitz* (1990) 51 Cal.3d 72, 90-91.) To be considered an accomplice, the witness must have "'act[ed] with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' [Citations.]" (*Ibid.*)

Assuming there was substantial evidence from which the jury could infer Carlson was an accomplice, the failure to instruct the jury to view his testimony with caution could not have been prejudicial to appellant. Much of Carlson's testimony was actually favorable to appellant, his testimony was amply corroborated by other witnesses, and the jury knew he made a deal with the state in order to avoid prosecution on the murder charge. Under these the circumstances, little would have been added by instructing the jury to view Carlson's testimony cautiously on the basis he was an accomplice. Accordingly, the absence of such an instruction does not warrant reversal. (*People v. Lewis, supra*, 26 Cal.4th at pp. 370-371.)

10

IV

Appellant further argues the court erred by failing to instruct the jury on the foundational requirements for an adoptive admission. This claim also fails.

Calderon testified that less than an hour after the stabbing, Carlson told him he had "beat the shit out of" Gorena and appellant had "stuck him." Because appellant was present but didn't say anything in response to Carlson's statement, the prosecutor argued appellant adopted the statement as true by virtue of his silence. Although it was not requested to do so, appellant contends the trial court should have instructed the jury on the foundational requirements for an adoptive admission.[2]

Appellant's claim is contrary to *People v. Carter* (2003) 30 Cal.4th 1166, 1198 (*Carter*), in which our Supreme Court ruled that trial courts do not have a sua sponte duty to give CALCRIM No. 357. Nevertheless, appellant argues the trial court should have given the instruction in his case because *Carter* was decided several years after this case arose, the bench notes to CALCRIM No. 357 do not acknowledge *Carter*'s holding, and much of the evidence presented against him consisted of hearsay.

However, irrespective of the holding in *Carter*, the Evidence Code makes clear the decision to instruct on the foundational requirements for certain evidentiary facts, such as those pertaining to adoptive admission, is a discretionary matter. (Evid. Code, § 403, subd. (c)(1).) While trial courts are empowered to instruct on those requirements, the Evidence Code does not require them to do so in the absence of a request from counsel. (*Ibid.*)

---

[2]  Those requirements are set forth in CALCRIM No. 357, which states: "If you conclude that someone made a statement outside of court that . . . tended to connect the defendant with the commission of the crime . . . and the defendant did not deny it, you must decide whether each of the following is true: [¶] 1. The statement was made to the defendant or made in (his/her) presence; [¶] 2. The defendant heard and understood the statement; [¶] 3. The defendant would, under all the circumstances, naturally have denied the statement if (he/she) thought it was not true; [¶] AND [¶] 4. The defendant could have denied it but did not. [¶] If you decide that all these requirements have been met, you may conclude that the defendant admitted the statement was true. [¶] If you decide that any of these requirements have not been met, you must not consider either the statement or the defendant's response for any purpose."

11

And in any event, any error in failing to give CALCRIM No. 357 was surely harmless. As *Carter* explained, "The instruction is largely a matter of common sense —silence in the face of an accusation is meaningful, and hence may be considered, only when the defendant has heard and understood the accusation and had an opportunity to reply." (*Carter, supra*, 30 Cal.4th at p. 1198.) So "[g]iving the instruction might cause the jury to place undue significance on bits of testimony that the defendant would prefer it not examine so closely." (*Ibid*.) Given the circumstances surrounding the statement in question and the strength of the evidence against appellant, it is virtually inconceivable he would have obtained a better result had CALCRIM No. 357 been given. Its absence from the court's instructions is not therefore cause for reversal.

V

Appellant argues the cumulative effect of the trial court's errors compels reversal. However, for the reasons explained above, we do not believe there was any error which, either alone or in combination of others, rendered appellant's trial unfair. Alas, this argument fails, too.

VI

At sentencing, the trial court failed to award appellant any presentence conduct credits. The parties agree, as do we, that appellant is entitled to conduct credit amounting to 15 percent of his actual time in custody. (Pen. Code, § 2933.1, subd. (a); *People v. Ly* (2001) 89 Cal.App.4th 44, 47.) We will modify the judgment accordingly.

DISPOSITION

The judgment is modified to award appellant 226 days of presentence conduct credit, which combined with his 1,509 days of custody, amounts to a total presentence credit award of 1,735 days. The clerk of the trial court is directed to prepare

12

an amended abstract of judgment reflecting this modification and send a certified copy to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.


                                        BEDSWORTH, ACTING P. J.


WE CONCUR:


MOORE, J.


FYBEL, J.